**FILED**

July 07, 2022

CLERK, U.S. DISTRICT COURT
WESTERN DISTRICT OF TEXAS

BY: _Breanna Coldewey_
DEPUTY

## UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## SAN ANTONIO DIVISION

**RUSSELL ZINTER**, *et al.*,

    *Plaintiffs*,

**v.**

**JOSEPH SALVAGGIO**, *et al.*,

    *Defendants*.

Case No. **5:18-cv-680-RCL**
~~*FILED UNDER SEAL*~~  *unsealed 7/13/22*

---

### MEMORANDUM OPINION

On several sunny days in June 2018 in Leon Valley, Texas, a group of protestors clashed with the local police department. These protestors took the phrase "government oversight" literally—videotaping and livestreaming Leon Valley Police Department ("LVPD") officers in person. When the dust settled, the LVPD had taken several protestors into custody (tasing one in the process) and confiscated a small film studio's worth of cell phones and video equipment. The protestors sued the officers and the City of Leon Valley (the "City" or "Leon Valley") for violating their First and Fourth Amendment rights. This is that lawsuit.

All three parties have moved for summary judgment. The LVPD officers argue that they are entitled to qualified immunity for their actions. The City contends that the officers' actions do not reflect a final policymaker's decision or a widespread custom of the LVPD. And the protestors assert that the officers' constitutional violations entitle them to judgment without a trial. In the Court's view, these arguments are a mixed bag. Some claims against the officers must proceed to trial. But the Court will dismiss other claims against the officers and the claims against the City. Based on the parties' motions, the record as a whole, certain publicly available videos, and applicable law, the Court will **GRANT IN PART** and **DENY IN PART** the defendant officers'

motion for summary judgment; will **GRANT** the City of Leon Valley's motion for summary judgment as to municipal liability; and will **DENY** plaintiffs' cross-motion for partial summary judgment. *See* Defs.' Mot. for Summ. J. ("LVPD Mot."), ECF No. 149; Defendant City Mot. for Summ. J. ("City Mot."), ECF No. 152; Pls.' Partial Mot. for Summ. J. ("Pls.' Mot."), ECF No. 153-1. The Court will also **ORDER** the defendant officers to show cause as to why the Court should not grant summary judgment in plaintiffs' favor on several claims.

## I.      BACKGROUND

On three separate days in June 2018, a group of protestors brushed up against the Leon Valley Police Department. The plaintiffs say that they were "detained, arrested, criminally charged," and had their property seized "without any lawful basis" by the LVPD. Second Am. Compl. ¶ 1, ECF No. 87. The defendants are then-LVPD Chief Joseph Salvaggio ("Chief Salvaggio"), various LVPD officers, and the City of Leon Valley. *Id.* ¶¶ 37–55. The parties dispute almost every detail about what occurred. "Undisputed" statements of facts are peppered with conclusory allegations and emotionally-charged language. *See, e.g.*, LVPD Mot. 6 (alleging "rapscallion activities" by plaintiffs); LVPD Mot. 12 (accusing plaintiffs of "instilling anarchy"); Pls.' Mot. 4 (alleging a "years-long witch hunt" by defendants).

To distill a signal from this noise, the Court will take a few steps. Almost every event in this case has been documented through video footage—either through the LVPD officers' bodycams or the protestors' own devices. A court should "assign greater weight . . . to the facts evident from video recordings taken at the scene" of a dispute. *Buehler v. Dear*, 27 F.4th 969, 979 (5th Cir. 2022) (quoting *Carnaby v. City of Houston*, 636 F.3d 183, 187 (5th Cir. 2011)). The Court will do so here. Plaintiffs have also posted some videos of these encounters on YouTube instead of submitting them as exhibits. Because these videos reproduce events captured by the

officers' bodycams, the Court takes judicial notice of their contents and considers them among the evidence submitted. *See* Fed. R. Evid. 201(b). And, finally, because so many facts are disputed, the Court will highlight areas with material disputes rather than list out each side's version of the story.

### A.     The June 14 Encounter

This saga begins with two protestors—nonparty Jesus Padilla and plaintiff Mark Brown. On June 14, 2018, Padilla and Brown tried to enter Leon Valley City Hall carrying video cameras. Brown Dep. 65:7–13, ECF No. 154-6. Leon Valley City Hall, like many municipal buildings, contains several government offices: relevant here, the police department and the municipal court. *See* ECF No. 151-1 at 64. That day, a Leon Valley municipal judge had entered an order prohibiting video recording in "the courtroom and court business areas." ECF No. 154-15 at 2.[1] Before Padilla and Brown entered the building, officers identified them and told them to "get off the front" of City Hall. Brown Dep. 66:1–5, 12–13.

The parties dispute what happened next, but it ended with both Padilla and Brown in handcuffs. As visible on video footage, officers walked over to Padilla and placed him in custody. PX-13 at 13:52:50–:53.[2] Another officer approached Brown and gestured for him to back away from Padilla. *Id.* at 13:52:53. As Brown stood in the street—all while holding his recording

---

[1] Plaintiffs argue that this "court decorum order" expressly ties Chief Salvaggio to the City for purposes of municipal liability. *See* Pls.' Mot. 11–12. In their view, Chief Salvaggio entered this order to retaliate against Padilla and the protestors. *See id.* On May 2, 2018, Padilla had attempted to record video footage inside of Leon Valley City Hall. After Padilla "repeatedly refused" orders to leave, officers arrested him. ECF No. 151-1 at 64. Padilla then "returned . . . and was promptly arrested for criminal trespass." *Id.* at 65. Chief Salvaggio did state that, after these incidents, he "began working with the [j]udges assigned to [Leon Valley] Municipal Court on a Court Decorum policy that would clearly identify where weapons and cameras were allowed." *Id.* Plaintiffs' emphasis on the motives behind this order are beside the point. As discussed below, the order had legal effect at the time of these incidents and was within the prerogative of Leon Valley municipal judges. *See infra* Part III.F.2.

[2] For ease of reference, the Court refers to plaintiffs' video exhibits as "PX" followed by their designation. The timestamps refer to those on the officers' bodycams.

devices—officers grabbed his arms and began struggling with him.  *Id.* at 13:52:58–:53:00.  Other officers soon rushed in.  *Id.*  Brown fell to the sidewalk (according to the officers, while resisting). *See* PX-11 at 13:56:30–:40; ECF No. 151-1 at 21.  An officer used his taser on Brown (according to Brown, "two or three times") while he was on the ground.  PX-11 at 13:56:45–:48; Brown Dep. 69:15–20.  The officers say that Brown resisted.  *See, e.g.*, ECF No. 151-1 at 21 (recalling that Brown "violently kick[ed] and thrash[ed] his body weight forcibly" after falling to the ground). Brown says that he never resisted.  Brown Dep. 76:5–7, 77:5–9 ("I didn't fight back at all. . . . [T]here was no fighting back at all.").  Once officers handcuffed Brown, they requested emergency medical services and escorted him to a local hospital.  *See* ECF No. 151-1 at 23; Brown Dep. 78:9– 79:2.

### B.     The June 18 Encounter

Four days later, another group of protestors arrived at Leon Valley City Hall.  These protestors included plaintiffs David Bailey, James Springer, Juan Gonzales, James Mead, and Russell Zinter.  Leon Valley City Hall's front entrance has two sets of glass double doors with a small foyer between them.  *See* PX-18 at 13:41:12.  Some plaintiffs stood in this foyer while protesting and recording City officials.  *Id.*  Plaintiff Bailey carried a "thin blue line" version of the American flag with him.  *See id.* at 13:46:17.  To protest the LVPD, Bailey held the flag up to the glass door and "dirtied [his] shoes" by stepping on the flag.  *See id.*; Bailey Dep. 34:21–22, ECF No. 151-1 at 54.  Officers watched this scene unfold.  *See generally* PX-18.

At one point, Bailey stood in front of the internal glass doors holding his flag.  *Id.* at 13:46:30.  A bystander opened the external set of doors to enter City Hall.  *Id.* at 13:46:30–:32. As she did so, Bailey stepped back from the internal set of doors.  *Id.*  On video, an officer can be heard saying: "Okay, the one with the flag, he's blocking the door. . . . Let's go."  *Id.* at 13:46:32–

:34. Officers entered the foyer and placed Bailey under arrest for obstructing a passageway. *Id.* at 13:46:34–:39. They then turned to the other plaintiffs in the foyer, demanded their recording devices, and placed them in handcuffs. *Id.* at 13:46:45–:47:00; Springer Aff. ¶ 4, ECF No. 153-3 at 82–83; Gonzales Aff. ¶ 4, ECF No. 153-3 at 96. Gonzales remained handcuffed in police custody for "about an hour." Gonzales Aff. ¶ 6. Officers held Bailey and Springer in custody overnight and transported them to the Bexar County jail. Bailey Dep. 50:12–51:19; Springer Aff. ¶¶ 9, 11.

While officers handcuffed those plaintiffs, one officer pointed to protestors on the public sidewalk in front of City Hall and stated: "We're gonna need those cameras." PX-86 at 13:47:44–:46. An officer ordered plaintiff James Mead to identify himself as a witness to a crime. *Id.* at 13:47:50–:54. Mead responded that he did not have his driver's license with him. *Id.* at 13:48:05–:10. The officer then accused Mead of refusing to identify and placed him in handcuffs. *Id.* at 13:48:10–:30. Mead estimated that the officers held him in custody for 30 minutes to one hour. *See* Mead Dep. 47:7–19, ECF No. 154-3 (stating that the "25–35 minute[]" mark occurred "[a]pproximately halfway through the time I was there"). At the same time, officers approached plaintiff Russell Zinter on the sidewalk in front of City Hall. PX-24 at 13:47:45. They ordered him to turn over his recording devices and to identify himself. *Id.* at 13:47:46–:48:03. Zinter complied. *Id.* at 13:48:00–:10. According to Mead and Zinter, they never witnessed the arrests in the City Hall foyer. Mead Aff. ¶ 3, ECF No. 153-3 at 78; Zinter Aff. ¶ 5, ECF No. 153-3 at 102.

### C.    The June 23 Encounter

On June 23, 2018—a Saturday—a crowd of people gathered at Leon Valley City Hall to protest.[3] Most of the plaintiffs in this case attended this protest. Plaintiff Springer and nonparty

---

[3] In a deposition, Chief Salvaggio stated that he did not know there would be a protest on June 23. He "went to work on a Saturday hoping they were gone" and represented that he "wouldn't say [he] had information they were going to

Bao-Qac Nguyen walked up and down the highway next to City Hall with large signs protesting the LVPD. *See* ECF No. 151-1 at 163. Both Springer and Nguyen livestreamed these events on their YouTube pages. *Id.*[4] Other protestors gathered around City Hall. *See, e.g.*, Jason Green Aff. ¶ 2, ECF No. 153-3 at 87; Egan Aff. ¶ 2, ECF No. 153-3 at 99. During this protest, an anonymous YouTube commenter posted Chief Salvaggio's home address on Nguyen and Springer's livestreams. *See, e.g.*, ECF No. 151-1 at 74, 77–80; 86–89.

At roughly 4:00 p.m., Chief Salvaggio left City Hall and told a protestor that he would speak to the group later that afternoon. Salvaggio Dep. 230:23–231:3; ECF No. 154-8 at 9. In the interim, Salvaggio called in other officers to prepare to "arrest at least two people." Salvaggio Dep. 231:7–19. Chief Salvaggio also spoke with the Bexar County District Attorney's office about "who should be arrested" and whether officers could "seize their cameras and identify them." *Id.* at 227:12–23; 232:2–15. No other officers were present for this phone call. *Id.* at 265:13–16.[5]

Video footage documents Chief Salvaggio's "press conference." Around 5:00 p.m., Chief Salvaggio addressed the crowd:

> First of all, thank you for coming to Leon Valley. Totally—totally support your right to put stuff online—your First Amendment right. What you don't have a right to do is be streaming things where police officers' or anybody else's family is being threatened or a violation of the state law. If you're not from Texas, you sure probably should know better, but if you stream something, you are responsible for its contents. There's death threats on y'all's

---

be there." Salvaggio Dep. 208:5–14, ECF No. 154-14. Plaintiffs argue that Salvaggio contradicts himself in these statements based on several email chains. In these emails, Salvaggio communicated with other law enforcement agencies about a potential protest on June 22, 2018. *See* ECF Nos. 154-10 & 154-50. Chief Salvaggio also exchanged emails with an anonymous tipster named "Bay Sock" who purported to give inside information on the overall group of protestors. *See, e.g.*, ECF No. 154-50.

[4] *See also* James Springer, *Protesting the Sovereign Citizens*, YouTube (June 23, 2018), https://www.youtube.com/watch?v=aVkky2nDMyA; Bao-Qac Nguyen, *We are protesting piggies guys*, YouTube (June 23, 2018), https://www.youtube.com/watch?v=s0d6WfZj1sg.

[5] Apparently, Chief Salvaggio had time to email "Bay Sock" (the anonymous tipster) to tell him to "[g]et ready to watch." ECF No. 154-56 at 3.

YouTube Live and every one of y'all will be held accountable for those death threats. Does everybody here understand what I'm telling you?

So, bottom line—you, [pointing at plaintiff Jonathan Green,] you're under arrest as well, move. Get up here.

\*       \*       \*

Everybody else—everybody else, you are not free to leave, come off the street.

Theresa Richard, *Press Confrence Leon Valley*, YouTube, at 00:00–1:24 (June 23, 2018), https://www.youtube.com/watch?v=HzRv6Hu3XOg. Officers quickly moved to arrest Nguyen and Springer, to seize plaintiffs' (many) recording devices, and to organize plaintiffs in front of City Hall. In Chief Salvaggio's telling, he kept these individuals in custody to "do a preliminary investigation, identify everybody[,] and hopefully release everybody" that the LVPD did not plan to charge with crimes. Salvaggio Dep. 255:6–9.[6] The plaintiffs sat in front of City Hall for roughly one hour. *See* Mead Dep. 144:12–15 (explaining that he remained in custody for "45 minutes to an hour" before being released). Officers called emergency medical services for one plaintiff—Kevin Egan—who began feeling "dizzy, light-headed, and short of breath." Egan Aff. ¶ 5–7, ECF No. 153-3 at 99.

The officers did not limit their canvassing to the crowd in front of City Hall. They approached other protestors standing nearby—including plaintiffs Brian Howd, Gregory Gardiner, and James Mead—and demanded their recording devices. *See* Howd Aff. ¶ 4, ECF No. 153-3 at 69; Gardiner Aff. ¶ 3, ECF No. 153-3 at 72; Mead Aff. ¶ 10–11. Howd ended up in handcuffs. Howd Aff. ¶ 5. Mead ended up sitting in a police cruiser. Mead Aff. ¶ 11, 13. Gardiner left after officers returned his property. Gardiner Aff. ¶ 5.

---

[6] *See also* Theresa Richard, *supra*, at 2:29–:43 ("Everyone's going to identify themselves, and if everybody—anybody has a camera on them or a phone on them, it's going to be taken as evidence.").

### D.   Procedural History

These events spurred a flurry of court filings. After these incidents, many plaintiffs were charged with criminal offenses in Leon Valley and Bexar County. *Zinter v. Salvaggio*, No. 5:18-cv-680 (JKP), 2021 WL 1381231, at *1 (W.D. Tex. Apr. 12, 2021). All criminal charges were eventually dismissed. *Id.* Separately, plaintiffs sued Chief Salvaggio, various LVPD officers, the City of Leon Valley, and two Bexar County District Attorneys under 42 U.S.C. § 1983 for violating their First and Fourth Amendment rights. *See generally* Second Am. Compl., ECF No. 87. Judge Jason K. Pulliam later dismissed the charges against the district attorneys. *Zinter*, 2021 WL 1381231, at *7–8.

At the beginning of this litigation, the plaintiffs filed motions for a temporary restraining order and preliminary injunction. *See* ECF Nos. 20, 46. The case was referred to Magistrate Judge Richard B. Farrer for pretrial proceedings. Order, ECF No. 42. Judge Farrer ultimately recommended denying the preliminary-injunction motion, which was later adopted. *See* ECF Nos. 62, 67. Judge Farrer also exercised his discretion to stay the case. Order, ECF No. 66. In Judge Farrer's view, no exigent circumstance demanded "an immediate start to full-blown discovery," which may have "inappropriately impede[d]" the then-pending criminal investigations. *Id.* at 1–2. Moreover, the proceedings "threaten[ed] to devolve into a distracting spectacle" because of the parties' behavior during a preliminary-injunction hearing. *Id.* at 2. The stay was lifted on October 14, 2020. Order, ECF No. 79. Pretrial proceedings then began in earnest. Judge Pulliam eventually set trial to begin on March 28, 2022. Scheduling Order, ECF No. 125. Before that trial, the case was reassigned to this Court for all proceedings. Order, ECF No. 155.

Each party filed a motion for summary judgment. *See* LVPD Mot.; City Mot.; Pls.' Mot. All three parties then filed responses to these dueling motions. *See* Defs.' Resp. in Opp. ("LVPD

Resp."), ECF No. 165; City Resp., ECF No. 169; Pls.' Resp. to Def. Officers, ECF No. 168-1;

Pls.' Resp. to City Mot., ECF No. 171-1.  And in March 2022, the parties filed their replies.  *See*

Defs.' Reply ("LVPD Reply"), ECF No. 189; City Reply, ECF No. 184; Pls.' Reply to Def.

Officers, ECF No. 182; Pls.' Reply to Def. City, ECF No. 181.  Because of the timing of these

motions, the voluminous record, and the likelihood that summary judgment would resolve several

claims, this Court vacated the previously set trial date.  Order, ECF No. 187.

## II.    LEGAL STANDARD

### A.    Summary Judgment

The parties have filed cross-motions for summary judgment.  A court may grant summary

judgment only if a movant "shows that there is no genuine dispute as to any material fact and the

movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A dispute is "genuine"

"if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A fact is "material" if it "might affect

the outcome of the suit." *Thomas v. Tregre*, 913 F.3d 458, 462 (5th Cir. 2019) (citing *Anderson*,

477 U.S. at 248).  "On cross-motions for summary judgment, [a court] review[s] each party's

motion independently, viewing the evidence and inferences in the light most favorable to the

nonmoving party." *Ford Motor Co. v. Tex. Dep't of Transp.*, 264 F.3d 493, 498 (5th Cir. 2001)

(citing *Taylor v. Gregg*, 36 F.3d 453, 455 (5th Cir. 1994).

Evidence presented at the summary-judgment stage need not be in admissible form.  *See*

*Lee v. Offshore Logistical & Transp., L.L.C.*, 859 F.3d 353, 355 (5th Cir. 2017) (citing Fed. R.

Civ. P. 56(c)).  But "the party submitting the evidence [must] show that it will be possible to put

the information . . . into an admissible form." *Campos v. Steves & Sons, Inc.*, 10 F.4th 515, 522

(5th Cir. 2021) (alterations in original) (quoting *Lee*, 859 F.3d at 355).  "Unsubstantiated

9

assertions, improbable inferences, and unsupported speculation are not sufficient to defeat a motion for summary judgment." *Brown v. City of Houston*, 337 F.3d 539, 541 (5th Cir. 2003).

Additionally, this summary-judgment record includes extensive video footage. A court should "assign greater weight . . . to the facts evident from video recordings taken at the scene." *Buehler*, 27 F.4th at 979 (quoting *Carnaby*, 636 F.3d at 187). A court is not required to accept statements of fact that are "blatantly contradicted by the record." *Tucker v. City of Shreveport*, 998 F.3d 165, 170 (5th Cir. 2021) (quoting *Scott v. Harris*, 550 U.S. 372, 380 (2007)). Instead, a court should "view[] the facts in the light depicted by the videotape." *Id.* (alteration in original) (quoting *Scott*, 550 U.S. at 381).

### B.    Qualified Immunity

Government officials are entitled to qualified immunity unless their conduct violates "clearly established" statutory or constitutional rights "of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). At summary judgment, a qualified-immunity analysis requires evaluating: (1) whether a reasonable jury could find that an official violated a statutory or constitutional right, and (2) whether the right at issue was "clearly established" so that, at the time, a "reasonable person would have known" they were violating that right. *Tucker*, 998 F.3d at 172. A court may decide these two elements in any order. *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "A good-faith assertion of qualified immunity alters the usual summary judgment burden of proof, shifting it to the plaintiff to show that the defense is not available." *Melton v. Phillips*, 874 F.3d 256, 261 (5th Cir. 2017) (en banc) (quoting *King v. Handorf*, 821 F.3d 650, 653 (5th Cir. 2016)).

Courts should not "define clearly established law at a high level of generality." *Ashcroft v. al-Kidd*, 563 U.S. 731, 742 (2011). "A clearly established right is one that is 'sufficiently clear

that *every reasonable official* would have understood that what he is doing violates that right.'"
*Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (emphasis added) (per curiam) (quoting *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). For example, the idea "that an unreasonable search or seizure violates the Fourth Amendment is of little help" when determining if conduct violated clearly established law. *al-Kidd*, 563 U.S. at 742 (citations omitted). "The dispositive question is whether the violative nature of *particular* conduct is clearly established," which "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Mullenix*, 577 U.S. at 12 (cleaned up). There need not be "a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741.

A court evaluating a qualified-immunity defense must "consider[] only the facts that were knowable to the defendant officers." *White v. Pauly*, 137 S. Ct. 548, 550 (2017) (per curiam). "Facts [that] an officer learns after the incident ends—whether those facts would support granting immunity or denying it—are not relevant." *Hernandez v. Mesa*, 137 S. Ct. 2003, 2007 (2017) (per curiam). That is because "[a]n official's actions must be judged in light of the circumstances that confronted him, without the benefit of hindsight." *Brown*, 623 F.3d at 253.

### III.   DISCUSSION

To evaluate plaintiffs' accusations, the Court must perform two types of analysis. First, the defendant officers argue that the "protective shroud of qualified immunity" shields them from any liability for plaintiffs' constitutional claims. *See* LVPD Mot. 13–14. Those claims are that the officers: (1) falsely arrested some plaintiffs; (2) unlawfully seized other plaintiffs; (3) unlawfully seized plaintiffs' property; (4) used excessive force during these encounters; and (5) retaliated against plaintiffs for exercising their First Amendment rights. Additionally, the Court must determine whether the City of Leon Valley may be held liable for plaintiffs' injuries.

The City contends that plaintiffs have not connected a city custom or policy to the alleged constitutional violations. The result is mixed—some claims need a trial to adjudicate, but other claims fail at this stage.

### A.     False-Arrest Claims

Plaintiffs allege that the defendant officers falsely arrested them. "A false-arrest claim requires a showing of no probable cause." *Westfall v. Luna*, 903 F.3d 534, 542 (5th Cir. 2018) (citing *Brown v. Lyford*, 243 F.3d 185, 189 (5th Cir. 2001)). "Probable cause exists when an officer is aware of 'reasonably trustworthy facts which, given the totality of the circumstances, are sufficient to lead a prudent person to believe' that a crime has been or will be committed." *Voss v. Goode*, 954 F.3d 234, 238–39 (5th Cir. 2020) (quoting *Kohler v. Englade*, 470 F.3d 1104, 1109 (5th Cir. 2006)). Because this test is objective, an officer may justify an arrest by showing probable cause for *any* crime—even if it is "only an after-the-fact justification." *Sam v. Richard*, 887 F.3d 710, 715–16 (5th Cir. 2018).

Even absent probable cause, an officer is entitled to qualified immunity if a reasonable person in the officer's position would have believed that his conduct did not violate clearly established law. *Voss*, 954 F.3d at 239 (citing *Freeman v. Gore*, 483 F.3d 404, 415 (5th Cir. 2007)). Many of plaintiffs' false-arrest claims fail because, at the time, the officers did not violate clearly established law. The Court takes each claim in turn.

### 1.     *Mark Brown's June 14 Arrest*

Plaintiff Mark Brown claims that officers unlawfully arrested him while he filmed Jesus Padilla's arrest. Second Am. Compl. ¶¶ 91–95. The officers argue that they arrested Brown for interference with public duties. *See* LVPD Mot. 4. An individual commits the crime of interference "if the person with criminal negligence interrupts, disrupts, impedes, or otherwise

interferes with . . . a peace officer while the peace officer is performing a duty or exercising authority imposed or granted by law." Tex. Penal Code § 38.15(a)(1). "[F]ailure to comply with a police officer's instruction to stand back . . . gives the officer probable cause to arrest" for interference. *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017). So too does "stepp[ing] forward toward [an officer]" and ignoring directions to stand back when a suspect is "10 to 15 feet away." *Haggerty v. Tex. S. Univ.*, 391 F.3d 653, 657 (5th Cir. 2004).

Brown's claim fails because a reasonable officer, at that moment, could believe that Brown had committed interference. Brown walked toward the officers arresting Padilla and, at one point, stood within five-to-ten feet of them. PX-13 at 13:52:50–:52; ECF No. 151-1 at 24. Detective Wells then ordered Brown to "stand across the street right now." Mark Brown, *Backing Up Mexican Padilla*, YouTube, at 13:15–:20 (June 14, 2018), https://www.youtube.com/watch?v=mFulFCPVUlw. After Brown demanded a "name and badge number," Detective Wells tried to place Brown in handcuffs. *Id.* at 13:20–:21. Because Brown stepped toward the officers arresting Padilla and disregarded an officer's instruction to "stand across the street," a reasonable officer could believe that Brown had violated § 38.15(a)(1). The defendant officers are therefore entitled to qualified immunity on Brown's false-arrest claim. Brown's cross-motion for summary judgment on this claim fails for the same reason.

### 2. David Bailey's June 18 Arrest

Officers arrested plaintiff David Bailey for obstructing the Leon Valley City Hall entrance. LVPD Mot. 4 (citing Tex. Penal Code § 42.03(a)). The applicable statute reads:

> (a) A person commits an offense if . . . he intentionally, knowingly, or recklessly:
>
>> (1) obstructs a highway, street, sidewalk, railway, waterway, elevator, aisle, hallway, entrance, or exit to which the public or a substantial group of the public has access, or any other place used for the passage of persons, vehicles,

> or conveyances, regardless of the means of creating the
> obstruction and whether the obstruction arises from his
> acts alone or from his acts and the acts of others;  or
>
> (2) disobeys a reasonable request or order to move issued by
> a person the actor knows to be or is informed is a peace
> officer, a fireman, or a person with authority to control
> the use of the premises:
>
> > (A)  to prevent obstruction of a highway or any of
> > those areas mentioned [in § 42.03(a)(1)] . . . .
>
> (b) For purposes of this section, "obstruct" means to render
> impassable or to render passage unreasonably inconvenient or
> hazardous.

Tex. Penal Code § 42.03.

By 2018, both Fifth Circuit and Texas case law had clearly established that officers lacked

probable cause to arrest a suspect who moves aside "as opposed to [his] standing in place or

making a pathway impassable." *Davidson v. City of Stafford*, 848 F.3d 384, 393 (5th Cir. 2017).

The act of remaining stationary—i.e., continuing to obstruct—is the critical fact.  *Compare*

*Sherman v. State*, 626 S.W.2d 520, 528 (Tex. Crim. App. 1981) (en banc) (holding no obstruction

occurred when a suspect only "caused a momentary hesitation of a vehicle"), *with Haye v. State*,

634 S.W.2d 313, 314–15 (Tex. Crim. App. 1982) (holding that a suspect obstructed a sidewalk by

"continu[ing] to stand in the middle" of the path and forcing a pedestrian to step around her).  For

example, the Texas Court of Criminal Appeals has explained that, "[i]f a parade is approaching

and an authority orders [people] to get off the road and they do so," no crime has occurred.  *Hardy*

*v. State*, 281 S.W.3d 414, 424 (Tex. Crim. App. 2009).

On these facts, no reasonable officer could conclude that probable cause existed to arrest

Bailey for obstruction.  Consider two video stills taken seconds before Bailey's arrest.

14





Bailey did stand in front of the entrance to City Hall. *See* PX-18 at 13:46:24. But Bailey plainly stepped aside for the bystander whom he purportedly obstructed. *Id.* at 13:46:30–:32. The bystander walked past Bailey without difficulty or impediment. *See id.* at 13:46:32. No reasonable officer could believe that Bailey had rendered the entrance impassable or unreasonably inconvenient. *See* Tex. Penal Code § 42.03(b). And by that time, case law indicated that a suspect's movement out of the way "requires a finding of no obstruction." *Davidson*, 848 F.3d at 393. Based on this evidence, a reasonable jury could conclude that the officers violated Bailey's

Fourth Amendment rights by arresting him without probable cause.  Since both qualified-immunity prongs are met, Bailey's claim survives summary judgment.

### 3.    *James Springer's June 18 Arrest*

The defendant officers are entitled to qualified immunity for plaintiff James Springer's June 18 arrest.  The officers arrested Springer for interfering with public duties and resisting arrest. LVPD Mot. 4–5.  After officers had arrested Bailey, they approached Springer.  An officer told Springer, "We need your camera, sir."  PX-21 at 13:47:02.  Springer moved his arm and held his recording device out of the officer's reach.  *Id.* at 13:47:05–:10.  When officers grabbed Springer's arm, he pulled that arm back.  *Id.* at 13:47:17–18.  Officers then pushed Springer against a wall to arrest him.  *Id.* at 13:47:23.

There are two potential statutes a reasonable officer could have believed that Springer violated.  First, as noted above, "failing to follow a deputy's instruction" has been held to violate Texas's interference statute.  *Westfall*, 903 F.3d at 534 (citing *Childers*, 848 F.3d at 415); *cf. Berrett v. State*, 152 S.W.3d 600, 604–05 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd) (holding that a suspect violated § 38.15(a)(1) by "filming and moving his arm out of [the officer's] reach").  A reasonable officer could believe that Springer interfered by refusing to hand over his phone.

Second, a reasonable officer could have believed that Springer resisted arrest.  A person resists arrest if he "intentionally prevents or obstructs a person he knows is a peace officer or a person acting in a peace officer's presence and at his direction from effecting an arrest, search, or transportation of the actor or another by using force against the peace officer or another." Tex. Penal Code  § 38.03(a).  It is "no defense . . . that the arrest or search was unlawful." *Id.* § 38.03(b).  Mere refusal to cooperate does not constitute resisting arrest—"there must be some

use of force" by the person. *Alexander v. City of Round Rock*, 854 F.3d 298, 305–06 (5th Cir. 2017) (citing *Sheehan v. State*, 201 S.W.3d 820, 823 (Tex. App.—Waco 2006, no pet.)). But "pulling out of an officer's grasp is sufficient to constitute resisting arrest." *Ramirez v. Martinez*, 716 F.3d 369, 376 (5th Cir. 2013) (citations omitted). This violation "can supply probable cause for the arrest itself." *Id.* By moving his phone away and trying to pull his arm from the officer's grip, Springer used force that impeded an officer's actions. A reasonable officer could have concluded that Springer's conduct violated the resisting-arrest statute.

Under either theory, the officers are entitled to qualified immunity on this false-arrest claim. No clearly established law existed at that time informing the officers that this arrest would violate Springer's Fourth Amendment rights.

### 4. *James Springer's June 23 Arrest*

Similarly, the officers are entitled to qualified immunity for Springer's claim arising from his June 23 arrest. On June 23, officers arrested Springer for retaliating by threat against a public servant—specifically, by posting Chief Salvaggio's address and threatening Chief Salvaggio's family. LVPD Mot. 5. A person commits retaliation by "intentionally or knowingly harm[ing] or threaten[ing] to harm another by an unlawful act" (1) in retaliation for their status as a public servant or (2) to prevent or delay them from acting as a public servant. Tex. Penal Code § 36.06(a). Another provision outlaws "post[ing] . . . the residence address or telephone number of an individual the actor knows is a public servant or a member of a public servant's family or household" on a "publicly accessible website" with the "intent to cause harm or a threat of harm to [them] in retaliation for or on account of the service or status of the individual as a public servant." *Id.* § 36.06(a-1).

Springer has not shown that the defendant officers violated a clearly established rule of law.  Again, qualified immunity is defeated only where "the law so clearly and unambiguously prohibited [the official's] conduct that *every* reasonable official would understand" that his actions would violate the law.  *Vincent v. City of Sulphur*, 805 F.3d 543, 547 (5th Cir. 2015) (citation omitted).  Springer does not identify any case—and the Court has found none—that would put a reasonable officer on notice that arresting Springer for comments made by anonymous users on Springer's livestream would violate the Fourth Amendment.  *See id.*  Without this threshold showing, Springer fails to overcome the officers' qualified-immunity defense for his June 23 arrest.

### 5.   *Joseph Pierce's June 23 Arrest*

The Court will also grant the officers qualified immunity for plaintiff Joseph Pierce's false-arrest claim.  Pierce alleges that the officers unlawfully detained or arrested him.  *See* Second Am. Compl. ¶ 169.  The officers concede that they did arrest Pierce that day.  *See* LVPD Mot. 5.  But Pierce did not contest this charge through the summary-judgment briefing.  A court may not grant a "default" summary judgment when a nonmovant fails to file a response.  *Morgan v. Fed. Express Corp.*, 114 F. Supp. 3d 434, 437 (S.D. Tex. 2015).  But a court "may find as undisputed the statement of facts in the motion for summary judgment."  *Id.*  Here, the officers' evidence includes a report that Pierce "refus[ed] to relinquish his recording device upon request from officers."  ECF No. 149-2 at 139.  "[F]ail[ing] to comply with an officer's instruction, made within the scope of the officer's official duty and pertaining to physical conduct rather than speech" may constitute interference.  *Childers v. Iglesias*, 848 F.3d 412, 415 (5th Cir. 2017); *see also* Tex. Penal Code § 38.15(a). Because the officers' adduced facts indicate that Pierce disobeyed officers' orders to

turn over his recording device, a reasonable officer could believe that Pierce had committed interference. The officers are thus entitled to qualified immunity for Pierce's June 23 arrest.

### 6.   *Jonathan Green's June 23 Arrest*

But plaintiff Jonathan Green's false-arrest claim surpasses the qualified-immunity threshold.[7] In the officers' telling, Green failed to turn over his recording devices after receiving a direct order. *See* Herberg Decl. 21–22, ECF No. 149-3. Video evidence contradicts this story. After announcing that the crowd would "be held accountable for [the] death threats" posted on YouTube, Salvaggio pointed at Jonathan Green and stated: "You—you, let's go, you're under arrest as well." Theresa Richard, *supra*, at 0:35–:50. Green walked toward Salvaggio, placed the items in his hands (a cigarette and a cell phone) on the ground, and presented his hands to the officers to be handcuffed. *Id.* at 0:52–:57.

No reasonable officer could believe that Green interfered with public duties or resisted arrest. An individual may commit the crime of interference by failing to comply with an officer's orders. *Westfall*, 903 F.3d at 544 (citing *Childers*, 848 F.3d at 415). And an individual may resist arrest by using force against an officer. *Alexander*, 854 F.3d at 305–06. But Jonathan Green obeyed officers' orders, *voluntarily surrendered himself* into police custody, and set his recording devices on the ground in front of Chief Salvaggio. Clearly established law states that an arrest must be supported by probable cause, and a reasonable jury could believe that officers arrested Green without probable cause, so the officers' qualified-immunity defense fails on this claim.

---

[7] Plaintiffs erroneously styled this claim under plaintiff *Jason* Green's name. They add to this confusion by, apparently, duplicating their affidavits. *Compare* Jason Green Aff. ¶¶ 5–6, ECF No. 153-3 at 87, *with* Jonathan Green Aff. ¶¶ 5–6, ECF No. 153-3 at 91. Deposition testimony makes clear that this claim relates to *Jonathan* Green's arrest. *See* Jonathan Green Dep. 53:21–22, ECF No. 168-17. ("You, he points at me. Get over here. You're under arrest."); Jason Green Dep. 63:7–9, ECF No. 168-17. ("[Chief Salvaggio] pointed right directly to my son, who was standing to the front and to the left of me, and said, you, you're under arrest.").

### 7.   *Jason Green's June 23 Arrest*

Officers also arrested Jason Green (Jonathan Green's father) after Chief Salvaggio's "press conference." *See* LVPD Mot. 5; Jason Green Dep. 75:9–19. The officers arrested Jason Green for interfering with public duties, resisting arrest, and failing to identify himself. LVPD Mot. 5. According to a police report, Jason Green refused to relinquish his recording device, then "'stiffened' his arms and attempted to 'pull away' from the officer" when an officer tried arresting him. ECF No. 154-58 at 32. But in Jason Green's own words:

> [The officer] said, I'm taking your stuff, and he grabbed my camera out of my hand, put my arms on my back, and then another cop came up from the other side and assisted with putting my arms behind my back. And—and that was it. And then I was under arrest, and they put me on the wall.

Jason Green Dep. 73:18–23. When asked whether he was "struggling not to be handcuffed," Green responded, "No, I know better than that." *Id.* at 74:24–75:1. According to Green, officers did not ask him for identification until after they handcuffed him. *Id.* at 79:4–6. Officers took Green "into the back room" of the police department and kept him in handcuffs for hours. *Id.* at 79:7–9; 80:6–8; 87:7–11. Green did not leave police custody until released by a Bexar County magistrate judge the following morning. *Id.* at 90:1–9; 91:2–3.

This claim must proceed to trial. To start, officers arrested Jason Green by placing him in handcuffs and keeping him custody overnight. *See Lincoln v. Turner*, 874 F.3d 833, 841–42 (5th Cir. 2017) (holding that officers arrested a suspect by handcuffing her and leaving her in a police car for roughly two hours). Did they have probable cause to do so? Based on the officers' telling, yes. Green ignored officers' orders to hand over his recording device, giving them probable cause to arrest for interference. ECF No. 154-58 at 32. And Green "stiffened" his arms and "pull[ed] away" from officers attempting to arrest him, thereby committing the crime of resisting arrest. *Id.*

But Green's version of events suggests the opposite. According to Green, the officers grabbed at his camera before he had a chance to respond. Jason Green Dep. 73:18–23. He did not resist when they handcuffed him. *Id.* at 74:24–75:1. And the officers did not ask him for identification until the handcuffs were on. *Id.* at 79:4–6. Because a reasonable jury could find that the officers lacked probable cause to arrest Jason Green, there is a genuine dispute of material fact as to this claim. Since it is clearly established that an arrest without probable cause violates the Fourth Amendment, Jason Green's claim must proceed to trial.

### 8.   *Brian Howd's June 23 Arrest*

Next up is plaintiff Brian Howd. The officers arrested Howd for interfering with public duties and resisting arrest when he did not turn over his video camera. LVPD Mot. 5. Bodycam footage paints a clear picture of this arrest, so the Court will favor the facts documented on video. As Howd stepped back from a group of protestors, an officer pointed to him and demanded his camera. PX-32 at 17:06:44–:46. Howd stopped in his tracks. *Id.* at 17:06:46–:53. The officer stated that Howd would be committing interference by not handing his camera over. *Id.* at 17:06:53–:07:00. The officer attempted to take Howd's camera. *Id.* at 17:07:14. Howd did not let go of the camera. *Id.* at 17:07:14–:15. The officer then grabbed Howd's arm and placed him in handcuffs. *Id.* at 17:07:16–:26.

The officers are entitled to qualified immunity on Howd's claim. At the time of Howd's arrest, Texas courts had explained that a suspect commits interference by "undertak[ing] affirmative physical action that interferes with the public duties of a peace officer." *In re S.O.T.*, No. 11:05-cv-159, 2007 WL 512724, at *5 (Tex. App.—Eastland Feb. 15, 2007). A court thus held that probable cause existed to arrest a suspect who "kept filming and moving his arm out of [an officer's] reach" and continually disregarded instructions to "put his right arm behind his

back." *Berrett v. State*, 152 S.W.3d 600, 604 (Tex. App.—Houston [1st Dist.] 2004, pet. ref'd). Another court had held that a plaintiff who refused to "cease photography and relinquish [a] camera" to officers and engaged in a "physical altercation" gave officers probable cause to arrest. *Cobarobio v. Midland Cnty.*, No. 7:13-cv-111 (RAJ), 2015 WL 13608102, at *2, 15 (W.D. Tex. Jan. 7, 2015). In light of this case law, a reasonable officer could have believed that Howd's actions—refusing to turn over the camera and holding the camera in place when the officer tried to wrest it from his grasp—constituted an affirmative physical act of interference. Since a reasonable officer could have concluded that probable cause existed to arrest Howd for interference, the officers are entitled to qualified immunity.

### B.     Unlawful-Seizure Claims

Plaintiffs' second category of claims involve allegedly unlawful seizures. For these claims, the defendant officers argue that they merely "detained" or "approached" the plaintiffs involved, as opposed to arresting them. *See* LVPD Mot. 4–5. The Fourth Amendment prohibits only "unreasonable . . . seizures." U.S. Const. amend. IV. "The extent of [the Fourth Amendment's] constitutional protection varies with the type of seizure at issue." *Lincoln v. Turner*, 874 F.3d 833, 840 (5th Cir. 2017). First are "arrests," which must be supported by probable cause. *United States v. Massi*, 761 F.3d 512, 520 (5th Cir. 2014) (citing *United States v. Zukas*, 843 F.2d 179, 181–82 (5th Cir. 1988)). Next are "detentions," which are "brief seizure[s] that must be supported by reasonable suspicion." *Id.* (quoting *Zukas*, 843 F.2d at 181). Last are "investigatory, suspicionless seizure[s]," which require a court to weigh the public's concern and interest against the interference with individual liberty. *Lincoln v. Scott*, 887 F.3d 190, 196 (5th Cir. 2018) (citing *Brown v. Texas*, 443 U.S. 47, 50–51 (1979)). To resolve these unlawful-seizure claims, the Court must determine where plaintiffs' claims fall on this spectrum.

### 1.    *Juan Gonzales's June 18 Seizure*

Juan Gonzales participated in the June 18 protest, standing in the City Hall foyer next to plaintiffs David Bailey and James Springer.  Gonzales attested that, during the scrum in the foyer, officers handcuffed him, seized his phone and video camera, and held him within the police department for "about an hour."  Gonzales Aff. ¶¶ 4–6, ECF No. 153-3 at 96.  The officers have argue that they merely "detained" Gonzales.  LVPD Mot. 4.

Gonzales's claim survives summary judgment—a reasonable jury could find that officers arrested him without probable cause.  "Handcuffing a suspect does not automatically convert an investigatory detention into an arrest requiring probable cause."  *United States v. Jordan*, 232 F.3d 447, 450 (5th Cir. 2000) (citing *United States v. Sanders*, 994 F.2d 200, 206 (5th Cir. 1993)).  But by 2018, a bevy of courts had held that officers arrest a suspect when (1) they handcuff him, (2) transport him to a secured location, and (3) hold him for more than 45 minutes.  *See, e.g.*, *Turner*, 874 F.3d at 841–42 (holding that a plaintiff plausibly alleged an arrest when an officer purportedly "handcuffed her and placed her in the back of a police car against her will for approximately two hours"); *United States v. Zavala*, 541 F.3d 562, 580 (5th Cir. 2008) ("[W]e have never held that a police officer may detain a defendant for one hour and 30 minutes until a full-blown drug investigation is completed."); *Freeman*, 483 F.3d at 413 (holding that officers arrested a woman when they handcuffed her, placed her in "the back of [a] police car," and "left [her] in the car for some 30 to 45 minutes").  Gonzales's seizure matches all three of these qualities.  Officers handcuffed him, brought him to a secure area within the police department, and kept him there for roughly one hour.  By perpetrating a de facto arrest without probable cause, the officers violated Gonzales's clearly established Fourth Amendment rights.

### 2.    *James Mead's June 18 Seizure*

During the June 18 episode, James Mead stood in front of City Hall holding recording devices. Mead attests that he never saw the arrests in the City Hall foyer. Mead Aff. ¶ 3. An officer approached Mead and ordered Mead to identify himself. PX-86 at 13:47:50–:54. When Mead responded that he did not have his driver's license with him, the officer placed Mead in handcuffs. *Id.* at 13:48:05–:30. Officers brought Mead into the police station and kept him there for 30 minutes to one hour. *See* Mead Dep. 47:7–19.

The Court sees little distinction between Gonzales's de facto arrest and Mead's seizure. The officers placed Mead in handcuffs, moved him inside the police department, and held him there—in handcuffs—for at least 30 minutes. Case law had clearly established that this conduct transformed a detention into a de facto arrest requiring probable cause. *See Freeman*, 483 F.3d at 413. And the defendant officers concede that they lacked probable cause to arrest Mead. *See* LVPD Mot. 4–5 (stating that Mead and Gonzales were "detained" by officers). Since a reasonable jury could find that officers violated Mead's clearly established Fourth Amendment rights, the officers' motion for summary judgment fails.

### 3.    *Russell Zinter's June 18 Seizure*

During the fracas surrounding David Bailey's arrest, officers approached plaintiff Russell Zinter on a public sidewalk. PX-24 at 13:47:45. The officers requested that Zinter identify himself and turn over his recording devices. *Id.* at 13:47:46–:48:03. Zinter complied. *Id.* at 13:48:00–:10.

At issue is whether the officers "seized" Zinter within the meaning of the Fourth Amendment. Because the officers did not exert physical force, they "seized" him only if they restrained his freedom of movement "by means of . . . a show of authority." *United States v.*

*Mendenhall*, 446 U.S. 544, 553 (1980).  Zinter may well have been seized.  *See Terry v. Ohio*, 392 U.S. 1, 16 (1968) (explaining that an officer has "seized" a person "whenever [he] accosts an individual and restrains his freedom to walk away").  But Zinter does not identify—and the Court has not discovered—case law clearly establishing that an officer violates the Fourth Amendment by stopping a potential witness for several minutes and demanding his recording devices.  The sparse cases to discuss witness detentions have found constitutional violations only for extended detentions, not for brief encounters like Zinter's.  *See infra* Part III.B.6.  Even if Zinter's seizure was unreasonable, he has not provided authority from the time of his seizure showing that a brief, investigatory stop and a demand to turn over recording devices violated the Fourth Amendment.  The officers are entitled to qualified immunity.

### 4. *Jack Miller's June 23 Seizure*

Plaintiff Jack Miller brought a claim alleging an unlawful seizure on June 23, 2018.  Second Am. Compl. ¶ 179.  This claim must be dismissed.  Miller testified in a deposition that "the closest that [he] came to a police [officer]" on June 23 was when he "was standing right behind . . . the officer that was arresting Brian Howd."  Miller Dep. 158:10–13, ECF No. 168-17.  Miller "fled" from the scene once he saw individuals being handcuffed.  *Id.* at 189:15–190:2.  But a seizure requires "*either* physical force . . . *or*, where that is absent, *submission* to the assertion of authority."  *California v. Hodari D*, 499 U.S. 621, 626 (1991) (emphasis in original).  Because Miller admits that he fled from the scene, he could not have been seized within the meaning of the Fourth Amendment.  The officers are thus entitled to qualified immunity on Miller's claim.

### 5. *Selena Herrera's June 23 Seizure*

Plaintiff Selena Herrera's unlawful-seizure claim must also be dismissed.  *See* Second Am. Compl. ¶ 174.  On July 29, 2021, Judge Farrer held a hearing on a pending motion by Herrera's

attorneys to withdraw from their representation. *See* Order, ECF No. 109. When Herrera did not

appear at that hearing, Judge Farrer ordered her to show cause as to why her claims should not be

dismissed for failure to prosecute. *Id.* Herrera did not respond to that order. Under Rule 41(b) of

the Federal Rules of Civil Procedure, a district court may dismiss a claim *sua sponte* for failure to

prosecute or failure to comply with a court order. *McCullough v. Lynaugh*, 835 F.2d 1126, 1127

(5th Cir. 1988). In accordance with prior warnings, the Court will treat Herrera's failure to show

cause as contumacious conduct and will dismiss her claims with prejudice. *See Long v. Simmons*,

77 F.3d 878, 880 (5th Cir. 1996) (requiring contumacious conduct and proof of lesser sanctions to

support a dismissal with prejudice).

### 6.    *The "Press Conference" Seizures*

The Court now reaches a group of plaintiffs that Chief Salvaggio ordered to sit on a ledge

outside Leon Valley City Hall on June 23, 2018.[8] Plaintiffs argue that the officers unreasonably

seized them. *See* Pls.' Resp. to Def. Officers 38–48. The officers argue that qualified immunity

bars plaintiffs' claims. *See* LVPD Mot. 9–13; LVPD Reply 2–3. The Court agrees with the

officers. Though plaintiffs have provided evidence of a constitutional violation, they have not

shown the Court that clearly established law put the officers on notice of potentially unlawful

conduct.

To start, the officers seized the plaintiffs attending Chief Salvaggio's "press conference."

A seizure occurs when an officer, by means of physical force or show of authority, intentionally

restrains a person's freedom of movement so that a reasonable, innocent person would have

believed that she was not free to leave, terminate the encounter, or decline the officer's request.

---

[8] These plaintiffs are James Mead, Kevin Egan, Juan Gonzales, and Theresa Richard. *See* Second Am. Compl. ¶¶ 166–83; Pls.' Resp. to Def. Officers 38–48. Mead further testified that an officer "placed [him] in the back seat of his patrol car for 20 to 25 minutes" before returning him to the ledge. Mead Dep. 68:1:7, ECF No. 154-3.

*See United States v. Flowers*, 6 F.4th 651, 655 (5th Cir. 2021); *Florida v. Bostick*, 501 U.S. 429, 434, 436, 438 (1991); *Mendenhall*, 446 U.S. at 554. Whether the officers seized these plaintiffs is not a close call. Chief Salvaggio told the crowd: "[E]verybody else, you are not free to leave, come off the street." Theresa Richard, *supra*, at 0:00–1:24. Officers surrounded these plaintiffs. *See, e.g.*, PX-31 at 17:07:05–:14. According to the plaintiffs, the officers kept them sitting in front of City Hall roughly one hour. *See* Mead Dep. 144:12–15 (stating that he remained in custody for "45 minutes to an hour" before being released). In doing so, Chief Salvaggio and the officers seized these plaintiffs by show of authority. It blinks reality to believe that a reasonable, innocent person would believe she could terminate this encounter when a police chief tells her, "You are not free to leave."

The next question is whether the officers can justify this seizure. If this seizure rose to the level of an arrest, then the officers patently committed a constitutional violation. "[A] seizure without probable cause to believe the person is guilty of a crime violates the Fourth Amendment." *Massi*, 761 F.3d at 523 (citing *Dunaway v. New York*, 442 U.S. 200, 210 (1979)). The same reasoning applies if the Court considers this seizure a *Terry*-style detention. Officers may briefly detain a suspect based on "reasonable suspicion that criminal activity is afoot." *Caroll v. Ellington*, 800 F.3d 154, 169 (5th Cir. 2015) (citing *Terry*, 392 U.S. at 27). But the officers here (apparently) detained these plaintiffs because "[t]hey were present" when "threats were being made." Salvaggio Dep. 254:25–255:5. The officers were "investigating" and "trying to identify people" because they did not know "who most of these people [were] that [had] been involved in those crimes." *Id.* at 235:16–23. As Chief Salvaggio explained, "everybody out there could be the one that's making the death threats." *Id.* at 145:17–21. No provision of the Texas Penal Code makes

it criminal to be a witness to a crime.  Without probable cause or reasonable suspicion, these officers violated the Fourth Amendment if they arrested or detained these plaintiffs.[9]

Even if the officers did not arrest or detain these plaintiffs, they still violated the Fourth Amendment.  An "investigatory, suspicionless seizure trigger[s] a Fourth Amendment reasonableness analysis." *Scott*, 887 F.3d at 196.  This analysis requires weighing (1) "the gravity of the public concerns served by the seizure," (2) "the degree to which the seizure advances the public interest," and (3) "the severity of the interference with individual liberty." *Brown*, 443 U.S. at 51.  The public concern here is significant.  Chief Salvaggio explained that he detained these plaintiffs because of death threats against him, which included an individual posting his home address online.  Salvaggio Dep. 145:17–21; 254:25–255:5.  Death threats menace officers who put their lives on the line for the good of their communities.  The public-interest factor also weighs in the LVPD's favor.  A reasonable officer may believe that these plaintiffs had helpful information to investigate these threats.  *See Turner*, 874 F.3d at 845.  But the individual-liberty factor swings the pendulum toward the plaintiffs.  This seizure was far from the "minimally intrusive" stops authorized for suspicionless seizures.  *See Illinois v. Lidster*, 540 U.S. 419, 427–28 (2004).  Officers detained these plaintiffs for roughly one hour.  The Court concludes that, even under the *Brown v. Texas* balancing test, the officers violated the Fourth Amendment.

That leaves the qualified-immunity question.  There is "little authority" discussing witness detentions.  4 Wayne R. LaFave, Search & Seizure: A Treatise on the Fourth Amendment § 9.2(b) (6th ed. 2021).  To be sure, that authority "indicates that the Fourth Amendment does not permit

---

[9] One question, then, is whether these seizures morphed into de facto arrests.  Case law strongly suggests that it did.  "[A] detention may be of excessively long duration" even when officers "have not completed and continue to pursue investigation of the matters justifying its initiation." *United States v. Shabazz*, 993 F.2d 431, 437 (5th Cir. 1993).  But the Supreme Court (and the Fifth Circuit) "have never held that a police officer may detain a defendant for one hour and thirty minutes" until an investigation is completed. *Zavala*, 541 F.3d at 580 (citing *United States v. Place*, 462 U.S. 696, 709–10 (1983)).  Plaintiffs' evidence, if believed, indicates that the officers held them in custody for roughly one hour—meaning that the officers, in fact, may have arrested them.

the stopping of potential witnesses to the same extent as those suspected of crime." *Id.* In two

cases arising from the same set of facts, the Fifth Circuit applied the *Brown v. Texas* balancing test

to a witness's detention when officers "handcuffed [her] and left [her] in the back of a police car

for almost two hours." *Turner*, 874 F.3d at 845. In both, the Fifth Circuit held that officers

unreasonably seized the woman. *Id.*; *Scott*, 887 F.3d at 197. "Although it may have been

reasonable 'to detain [the woman] for some amount of time to determine her role in the

situation[,]'" officers "exceeded this authority when [they] . . . detained her in the back of a police

car for two hours.'" *Id.* (quoting *Turner*, 874 F.3d at 849). And, in *Freeman*, the Fifth Circuit

held that an individual who was handcuffed and placed in the back of a police car "for some 30 to

45 minutes" was "restrained to an extent that normally accompanies a formal arrest." *Freeman*,

483 F.3d at 413.

Despite this case law, the Court concludes that the defendant officers are entitled to

qualified immunity for these seizures. At the time of these offenses, no case law suggested that an

officer violated the Fourth Amendment by detaining a witness to a crime without handcuffs for

roughly one hour. Few courts of appeals—let alone the Supreme Court—had evaluated this issue.

4 LaFave, *supra*, § 9.2(b). And even if the Fifth Circuit's decisions in *Turner*, *Scott*, and *Freeman*

clearly established that certain witness detentions may give rise to Fourth Amendment violations,

this case presents an entirely different set of facts. The detainees in *Turner*, *Scott*, and *Freeman*

were handcuffed and detained in the back of police cruisers. In *Freeman*, the detention lasted for

"some 30 to 45 minutes." *Freeman*, 483 F.3d at 413. In *Turner* and *Scott*, the detention lasted for

two hours. *Scott*, 887 F.3d at 197. The plaintiffs here were not handcuffed, were not placed in the

back of police vehicles, and were released after approximately one hour.[10] Those cases did not

---

[10] Plaintiff James Mead did testify that an officer "placed [him] in the back seat of his patrol car for 20 to 25 minutes" before returning him to the ledge. Mead Dep. 68:1:7, ECF No. 154-3. But the dispositive question for qualified

make clear to "every reasonable official" that detaining witnesses to a crime, without handcuffs and without moving them to a police vehicle, violated the Fourth Amendment. *Mullenix*, 577 U.S. at 11.

The Supreme Court has directed lower courts not to "define clearly established law at a high level of generality." *al-Kidd*, 563 U.S. at 742. This Court will heed this edict. Plaintiffs' claims for unreasonable seizures based on Chief Salvaggio's "press conference" must be dismissed on qualified-immunity grounds.

### 7.    *Gregory Gardiner's June 23 Seizure*

Plaintiff Gregory Gardiner contends that the defendant officers unlawfully seized him on June 23, 2018. Second Am. Compl. ¶ 173. Gardiner attended the protest carrying multiple firearms. Gardiner Dep. 51:19–22, ECF No. 168-17. During Chief Salvaggio's "press conference," an officer seized Gardiner's video camera. *See id.* at 67:2–19. After a brief respite, two officers approached Gardiner again. PX-31 at 17:09:45. One of the officers placed Gardiner in handcuffs. *Id.* at 17:09:50–:10:00. The officers took Gardiner's firearms from him. *Id.* at 17:10:00–:30. An officer escorted Gardiner to the front of City Hall to sit with the other protestors. Gardiner Dep. 73:14–17. Gardiner remained under police supervision for at least 30 to 45 minutes. Officer Farias Dep. 217:22–218:2, ECF No. 154-12. Officers, at some point, removed Gardiner's handcuffs. *See* Gardiner Dep. 74:24–75:8; PX-29 at 18:20:40. They then brought Gardiner inside City Hall, took a photo of him, returned his firearms, and informed him that he was being released. PX-29 at 18:20:45–:21:00. The officers characterize this conduct as "an investigation" into Gardiner's "possible unlawful[] carrying." LVPD Mot. 5.

---

immunity "is whether the violative nature of *particular* conduct is clearly established." *Mullenix*, 577 U.S. at 12 (cleaned up). Mead was not detained in a police vehicle as long as the defendant in *Freeman. See Freeman*, 483 F.3d at 413. The Court's conclusion with respect to clearly established law therefore applies equally to Mead's detention.

Gardiner's unlawful-seizure claim fails because he has not identified clearly established law showing that this conduct violated the Fourth Amendment. Under Texas law, individuals are prohibited from carrying handguns in public if they have been convicted of certain crimes. *See* Tex. Penal Code 46.02. At the time of Gardiner's alleged seizure, Gardiner was carrying firearms openly in an area in which officers had arrested numerous individuals. "The police may take reasonable actions under the circumstances to ensure their own safety, as well as the safety of the public, during an encounter with a suspect." *United States v. Abdo*, 733 F.3d 562, 565 (5th Cir. 2013). These actions may include temporarily seizing weapons "for the safety of themselves" and others. *United States v. Roberts*, 612 F.3d 306, 313–14 (5th Cir. 2010). And, as discussed above, Fifth Circuit case law had not clearly established that Gardiner's seizure—for 30 to 45 minutes, with handcuffs removed at some point—violated the Fourth Amendment. The Court thus concludes that the officers are entitled to qualified immunity on Gardiner's claim.

### C.    Unlawful Seizure-of-Property Claims

Plaintiffs next allege that the officers violated their Fourth Amendment rights by seizing personal property—cell phones, video cameras, hard drives, and the like—without a warrant. *See* Second Am. Compl. ¶¶ 105–07; 147–55; 166–83. Chief Salvaggio apparently believed this practice to be permissible:

> Q: . . . And so your understanding is that you have the authority to just walk up to any citizen and take their devices without any—without any warrant if they filmed a crime?
>
> A: If they filmed a crime, absolutely. That is my understanding, and that is exactly what the best practices say you can do.

Salvaggio Dep. 244:10–16. According to Salvaggio, the Bexar County District Attorney's office even approved of this practice. *See* Salvaggio Dep. 135:23–136:16.

A "seizure" of property occurs when "there is some meaningful interference with an individual's possessory interests in that property." *United States v. Jacobsen*, 466 U.S. 109, 113 (1984). Subject to a few exceptions, "seizures conducted outside the judicial process, without prior approval by a judge or magistrate, based on probable cause, are per se unreasonable under the Fourth Amendment." *Freeman v. City of Dallas*, 186 F.3d 601, 605 (5th Cir. 1999). The Court agrees that the officers may have violated the Fourth Amendment. But plaintiffs have failed to identify clearly established law showing that, at the time of these seizures, every reasonable officer would know they violated by the Fourth Amendment by seizing recording devices from witnesses to a crime.

Two exceptions are relevant here. One is the exigent-circumstances exception. Officers may seize property without a warrant if the exigencies of a situation make law enforcement's needs especially compelling. *See Missouri v. McNeely*, 569 U.S. 141, 148–49 (2013) (citation omitted). To determine whether exigent circumstances were present, a court should consider several factors:

> (1) the degree of urgency involved and the amount of time necessary to obtain a warrant;
>
> (2) the reasonable belief that contraband is about to be removed;
>
> (3) the possibility of danger to the police officers guarding the site of contraband while a search warrant is sought;
>
> (4) the information indicating that the possessors of the contraband are aware that the police are on their trail; and
>
> (5) the ready destructibility of the contraband and the knowledge that efforts to dispose of it and to escape are characteristics in which those trafficking in contraband generally engage.

*United States v. Aguirre*, 664 F.3d 606, 611 (5th Cir. 2011) (quoting *United States v. Mata*, 517 F.3d 279, 287 (5th Cir. 2008)).

The second exception stems from *United States v. Place*, 462 U.S. 696 (1983).  In *Place*, the Supreme Court held that "brief detentions of personal effects may be so minimally intrusive of Fourth Amendment interests that strong countervailing governmental interests will justify a seizure based only on specific articulable facts that the property contains contraband or evidence of a crime." *Id.* at 706.

The officers' warrantless seizures bode poorly under either exception.  The exigent-circumstance factors seem largely inapposite to the facts of this case.  In Chief Salvaggio's telling, "the exigency . . . was that we need to ensure that we got the phone[s]." Salvaggio Dep. 136:13–16.  By confiscating phones, police avoided "losing evidence." *Id.* at 134:16–21.  Salvaggio believed that search warrants could be obtained after seizing the evidence. *Id.* at 136:13–16.  True, a suspect who possesses incriminating evidence may try to destroy that evidence.  But the plaintiffs here were *bystanders* to alleged crimes—many seemed surprised even to be questioned, detained, or arrested.  Many plaintiffs, moreover, fully intended to make their videos public by publishing them online.  Some even livestreamed these events as they occurred.  The concerns justifying the exigent-circumstances exception—notably, the belief that "contraband is about to be removed," the "possibility of danger" to officers, and the knowledge that those holding the contraband might take "efforts to dispose of it"—are not present in this case.[11]

Nor does the *Place* exception apply. *Place* involved only "brief detentions" that were "minimally intrusive of Fourth Amendment interests" and justified by "specific articulable facts" that the property contained evidence of a crime. *Place*, 462 U.S. at 706.  Other circuits have held

---

[11] In *Crocker v. Beatty*, 886 F.3d 1132 (11th Cir. 2018), the Eleventh Circuit found these concerns persuasive. Police had seized the cell phone of a bystander to a car accident. *Id.* at 1136.  The court affirmed a finding that police had violated the Fourth Amendment, refusing to apply a qualified-immunity defense because "the right to be free from warrantless seizures of personal property, absent an applicable exception, was clearly established" at the time of the seizure. *Id.* at 1137–38.

that even under *Place*, the days-long seizure of personal effects like cell phones and cameras is

unreasonable. *See Robbins v. City of Des Moines*, 984 F.3d 673, 681 (8th Cir. 2021); *United States*

*v. Babcock*, 924 F.3d 1180, 1190–91 (11th Cir. 2019). That is the case here. Plaintiffs attested

that they did not receive their property until *years* after the officers seized them. *See, e.g.*, Richard

Dep. 46:3–7; Gonzales Dep. 81:9–13. Nor have the officers pointed to specific, articulable facts

that plaintiffs' recording devices contained evidence of crimes.

Despite the constitutional violation, the defendant officers are still entitled to qualified

immunity. At the time of these seizures, no law existed that clearly established that warrantless

seizures of witnesses' recording devices were unlawful. To the Court's knowledge, only two

federal courts of appeals have considered this issue. *See Crocker*, 886 F.3d at 1136; *Robbins*, 984

F.3d 681. *Crocker* was issued mere months before the events in this case; *Robbins* was issued

years later. Both are out-of-circuit precedents. Plaintiffs must show that "existing precedent" has

"placed the statutory or constitutional question beyond debate." *al-Kidd*, 563 U.S. at 741; *see also*

*Vincent v. City of Chester*, 805 F.3d 543, 549 (5th Cir. 2015) (explaining that "two out-of-circuit

cases and a state-court intermediate appellate decision hardly constitute persuasive authority"

clearly establishing law). They have not. The officers are therefore entitled to qualified immunity

for the seizure-of-property claims. Plaintiffs' motion for summary judgment fails for the same

reasons. *See* Pls.' Mot. 37–41.

### D.   Excessive-Force Claims

Several plaintiffs assert that the defendant officers used excessive force when arresting or

detaining them. "The Fourth Amendment prohibits police from using more force than is

reasonably necessary to effectuate an arrest." *Buehler*, 27 F.4th at 980. This analysis is "separate

and distinct" from the analysis for false-arrest claims. *Freeman*, 483 F.3d at 417. An excessive-

force claim requires a plaintiff to show: "(1) injury, (2) which resulted directly and only from a use of force that was clearly excessive, and (3) the excessiveness of which was clearly unreasonable." *Hanks v. Rogers*, 853 F.3d 738, 744 (5th Cir. 2017) (quoting *Cooper v. Brown*, 844 F.3d 517, 522 (5th Cir. 2016)).

The injury element "is a sliding scale, not a hard cutoff." *Buehler*, 27 F.4th at 969. "[A]s long as a plaintiff has suffered 'some injury,' even relatively insignificant injuries and purely psychological injuries will prove cognizable when resulting from an officer's unreasonably excessive force." *Alexander v. City of Round Rock*, 854 F.3d 298, 309 (5th Cir. 2017) (quoting *Brown v. Lynch*, 524 F. App'x 69, 79 (5th Cir. 2013)). Additionally, courts often collapse the "clearly excessive" and "unreasonable" elements together. *See Solis v. Serrett*, 31 F.4th 975, 981 (5th Cir. 2022); *Buehler*, 27 F.4th at 981. "[T]he touchstone of [the] inquiry is simply the reasonableness of the force employed." *Buehler*, 27 F.4th at 981. Factors to guide a court are: "(1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of officers or others, and (3) whether the suspect was actively resisting . . . or attempting to evade arrest." *Joseph v. Bartlett*, 981 F.3d 319, 332 (5th Cir. 2020) (citing *Graham v. Connor*, 490 U.S. 386, 396 (1989)).

Because the defendant officers assert a qualified-immunity defense, plaintiffs "must rebut the defense by establishing a genuine fact issue as to whether the [officers'] allegedly wrongful conduct violated clearly established law." *Darden v. City of Fort Worth*, 880 F.3d 722, 727 (5th Cir. 2018) (quoting *Brown v. Callahan*, 623 F.3d 249, 253 (5th Cir. 2010)). A court must "examine each officer's actions independently to determine whether [he or she] is entitled to qualified immunity." *Solis*, 31 F.4th at 981 (citing *Meadours v. Ermel*, 483 F.3d 417, 421–22 (5th Cir. 2007)). In doing so, the Court must view the facts in the light most favorable to plaintiffs and

draw all reasonable inferences in their favor. *See Aguirre v. City of San Antonio*, 995 F.3d 395, 406 (5th Cir. 2021).

### *1.     Mark Brown's June 14 Arrest*

On June 14, 2018, LVPD officers arrested Mark Brown in front of Leon Valley City Hall. Brown brings excessive-force claims: (1) against Detective Wells for "grabb[ing] and push[ing] him into the street; (2) against Officer Farias for "maneuver[ing] a takedown" and "flattening" his head into the sidewalk; (3) against Officer Yarbrough for holding him on the ground "against his will"; and (4) against Officer Vasquez for tasing him while he lay prone. Pls.' Resp. to Def. Officers 21–22. Detective Wells is entitled to qualified immunity. But the claims against Officers Farias, Yarbrough, and Vasquez must proceed to trial.

#### *a)     Constitutional Violation*

The Court begins with the first prong of a qualified-immunity analysis—the denial of a constitutional right. According to Brown, officers injured his ribs and neck by "pummel[ing]" him and using a taser on him, causing bruises and aggravating his post-traumatic stress disorder ("PTSD"). *See* Brown Dep. 57:4–10, 114:18–115:15, 129:7–10, ECF No. 154-6. These injuries carry "relatively little weight in [a] Fourth Amendment reasonableness analysis." *Buehler*, 27 F.4th at 983. Injuries like abrasions, back and neck pain, and bruising "are properly characterized as 'minor' for purposes of excessive-force analysis." *Id.* The same applies to Brown's allegations of psychological harm. Psychological harm can serve as the basis for an excessive-force claim. *See Tarver v. City of Edna*, 410 F.3d 745, 752 (5th Cir. 2005). But Brown did not link his PTSD to the specific takedown and tasing he suffered—instead, he acknowledged that his PTSD arose from a prior run-in with the Tucson Police Department. Brown Dep. 57:11–22. These minimal injuries weigh slightly in the officers' favor.

The severity of the alleged crimes is minor. Officers arrested Brown for resisting arrest and interfering with public duties—both of which are misdemeanors. *See* Tex. Penal Code §§ 38.03(c), 38.15(b); *see generally* ECF No. 153-3 (listing charged offenses). Misdemeanors are "minor offense[s] militating against the use of force." *Trammell v. Fruge*, 868 F.3d 332, 340 (5th Cir. 2017) (citing *Reyes v. Bridgwater*, 362 F. App'x 403, 407 n.5 (5th Cir. 2010)). This factor weighs in Brown's favor.

A fact dispute exists, however, about whether Brown actively resisted arrest. Several officers testified that Brown resisted their efforts to secure him. *See* Wells Dep. 44:17–22, ECF No. 154-25; Farias Dep. 69:13–20, ECF No. 154-12. Officer Vasquez further testified that Brown was "violently kicking and thrashing his body" while prone. Vasquez Dep. 99:10–13, ECF No. 154-36. But Brown's testimony contradicts this story. When asked whether he resisted the officers, Brown stated: "[A]bsolutely not. I had both of my hands occupied with phones and . . . my tablet. . . . I didn't fight back at all." *Id.* at 76:5–7.

A court must credit a nonmovant's version of events "unless contrary video evidence provides so much clarity that a reasonable jury could not believe his account." *Aguirre*, 995 F.3d at 410 (citing *Darden*, 880 F.3d at 730). The available video footage does not answer the resistance question one way or the other. Brown does struggle with Detective Wells and Officer Vasquez when they attempt to handcuff him. PX-13 at 13:53:03–:12. But once Brown falls to the ground, the footage becomes much murkier. Brown can be heard yelling, "Get off me!" PX-11 at 13:56:36. Officers yell, "taser" and "tase him." *Id.* at 13:56:41–:43. The sound of a taser discharge can be heard, and Brown can be heard screaming. *Id.* at 13:56:45–:48. Brown kicks his legs around wildly in response. PX-12 at 13:53:34–:39. While the taser discharge is ongoing, Officer Farias pushes Brown's head down to the sidewalk. PX-11 at 13:56:48–:56.

The Court can still draw several conclusions from this evidence. First, Brown actively resisted arrest before falling to the ground. Video footage shows Brown preventing Detective Wells and Officer Vasquez from placing his arms behind his back. PX-13 at 13:53:03–:12. "[P]ulling out of an officer's grasp is sufficient to constitute resisting arrest." *Ramirez*, 716 F.3d at 376. So, Brown's resistance to Detective Wells and Officer Vasquez—however slight—would militate against Brown's excessive-force claim.

Second, it remains ambiguous whether Brown resisted during the period between falling to the ground and being tased. The available video footage does not paint a clear picture either way.[12] Without video evidence "eliminat[ing] any feasible claim that [Brown's] account of events is true," *Aguirre*, 995 F.3d at 410–11, the Court must credit Brown's testimony that he "didn't fight back at all," Brown Dep. 76:5–7. Brown's nonresistance, then, supports an excessive-force finding.

Third, there are genuine disputes about the exact force the officers used. Brown testified that officers "attack[ed]" and "beat[]" him. Brown Dep. 75:9, 24–25. He remembered "being pummeled" and "being punched" by officers. *Id.* at 109:16–17, 22–23. Video footage refutes this testimony up to the point when Brown falls on the ground. *See, e.g.*, PX-13 at 13:53:03–:12. Once Brown falls over, the video evidence becomes ambiguous once again. Brown also does not recall how many times the officers applied their tasers. Brown Dep. 78:3–13. The officers gave different answers to this question. In a police report, Officer Vasquez stated that he performed two drive

---

[12] Four videos are available to the Court. One is from Brown's device, which he dropped during the arrest. Mark Brown, *Backing Up Mexican Padilla*, YouTube (June 14, 2018), https://www.youtube.com/watch?v=mFulFCPVUlw. The remaining three videos are from officers' bodycams. *See* PX-11, PX-12, PX-13. Officer Farias's bodycam appears covered up by Brown's shirt. PX-11 at 13:56:35–:42. The bodycam then shows Officer Farias pushing Brown's head against the sidewalk while Brown is being tased. *Id.* at 13:56:48–:56. The second bodycam shows officers attempting to handcuff Brown but does not show Brown himself—at least until Brown starts kicking his legs while being tased. PX-12 at 13:53:34–:39. The third bodycam fell off of the officer's uniform when Brown fell on the ground. PX-13 at 13:53:15–:25.

stuns. ECF No. 151-1 at 21. On bodycam footage, a taser discharge is audible *before* Brown begins kicking his legs. PX-12 at 13:53:34–:39. But in his deposition, Officer Vasquez stated that he conducted only *one* drive stun *after* Brown "started violently kicking and thrashing his body." Vasquez Dep. 99:10–13, ECF No. 154-36. Another bodycam shows an officer placing a taser into the small of Brown's back after the first drive stun, though it is unclear whether that officer performed a separate drive stun. PX-11 at 13:57:02–:05.

Brown's claim against Detective Wells fails on these facts. Video footage shows that Detective Wells did not push or shove Brown into the street. It further shows that Brown resisted arrest by trying to pull out of Detective Wells's grasp. Though the severity of the offense was minor, Brown's active resistance and Detective Wells's limited use of force leads the Court to conclude that Detective Wells did not act unreasonably.

But genuine disputes of material fact preclude summary judgment for Officers Farias, Yarbrough, and Vasquez. "If [a] suspect lacks any means of evading custody—for example, by being pinned to the ground by multiple police officers—force is not justified." *Joseph*, 981 F.3d at 335 (citing *Cooper*, 844 F.3d at 524; *Ramirez*, 716 F.3d at 378). It is objectively unreasonable "for an officer to use injurious force against a non-resisting, non-dangerous individual who is not suspected of a serious crime"—especially when "force is applied after the suspect has been restrained and subdued." *Aguirre*, 995 F.3d at 412 (citing *Darden*, 880 F.3d at 731; *Curran v. Aleshire*, 800 F.3d 656, 661 (5th Cir. 2015); *Ramirez*, 716 F.3d at 378; *Bush v. Strain*, 513 F.3d 492, 501 (5th Cir. 2008)). Officers Farias, Yarbrough, and Vasquez all applied force against Brown while pinning him to the sidewalk. Officer Vasquez may have tased Brown multiple times. If a reasonable jury believed that Brown was not resisting, it could conclude that these three officers' uses of force violated the Fourth Amendment.

*b)*     *Clearly Established Law*

The same fact disputes prevent the Court from granting qualified immunity. It has "long been established" in the Fifth Circuit that "[o]fficers engage in excessive force when they physically strike a suspect who is not resisting arrest." *Joseph*, 981 F.3d at 342.  For example, in *Darden*, an officer threw a non-resisting suspect to the ground and tased him.  *Darden*, 880 F.3d at 731.  Another officer punched, kicked, and choked the suspect.  *Id.* at 732.  The Fifth Circuit held that both officers violated clearly established law because "a constitutional violation occurs when an officer tases, strikes, or violently slams an arrestee who is not actively resisting arrest." *See id.* at 731.  But the court explained that a jury might conclude that the suspect resisted arrest, meaning that the officer's "decisions to force [the suspect] to the ground and tase him might have been reasonable."  *Id.* at 732.  As in *Darden*, a reasonable jury could find that Brown did or did not resist arrest.  If Brown did resist, then the officers' actions may have been objectively reasonable.  But at the summary-judgment stage, the Court must accept Brown's version of the story.  If Brown's facts are true, then Officers Farias, Yarbrough, and Vasquez used force disproportionate to the situation and thereby violated Brown's clearly established Fourth Amendment rights.  Accordingly, these officers' qualified-immunity defense fails at this stage.

*c)*     *Brown's Motion for Summary Judgment*

Brown also moves for summary judgment for the force used by Detective Wells. Pls.' Mot. 32–36.  Wells "grabbed and pushed Brown into the street," and "maneuvered a takedown . . . [that] resulted in an unreasonable assault, tackling, tasering, and cuffing."  *Id.* at 33. This motion fails as a matter of law.  Brown's argument misunderstands the standard for excessive-force claims.  The injury allegedly caused by excessive force must "result[] directly and only" from that use of force.  *Hanks*, 853 F.3d at 744.  Though Brown seeks to hold Detective Wells

liable for all harms resulting from the incident, other officers independently took actions that precipitated Brown's injuries. Detective Wells can be held liable only for injuries caused by his excessive force. *See Goode v. Baggett*, 811 F. App'x 227, 231 (5th Cir. 2020). Video footage shows that Detective Wells did not assault, tackle, or tase Brown. *See* PX-13 at 13:52:54–13:53:15. Detective Wells pointed at Brown, placed his hands on Brown's abdomen, and grabbed Brown's arm to handcuff him. *See id.* Since video footage eliminates any ambiguity about these events, the Court reiterates its holding that Detective Wells's use of force was not objectively unreasonable. Brown's motion for summary judgment therefore fails.

### 2. David Bailey's June 18 Arrest

As explained above, officers arrested David Bailey for obstructing a passageway. Bailey argues that the officers used unconstitutionally excessive force during this arrest. Pls.' Resp. to Def. Officers 36. But Bailey did not assert this claim in the plaintiffs' operative complaint. Courts may "disregard claims or theories of liability not present in the complaint and raised first in a motion opposing summary judgment." *Jacked Up, L.L.C. v. Sara Lee Corp.*, 854 F.3d 797, 810 (5th Cir. 2017) (quoting *De Franceschi v. BAC Home Loans Servicing, L.P.*, 477 F. App'x 200, 204 (5th Cir. 2012)). Since Bailey raised this argument for the first time in response, the Court will disregard his excessive-force allegations.

### 3. James Mead's June 18 Arrest

Officers arrested James Mead in the scrum surrounding David Bailey's arrest. Mead alleges an excessive-force claim about his handcuffing. In his deposition, Mead testified that Officer Mandry "tightened the handcuffs even tighter on [his] wrists." Mead Dep. 41:17–22, ECF No. 154-3 at 13. But Mead conceded that the handcuffs were "[n]ot painfully tight" and did not

seek medical assistance for his apparent injuries. *Id.* at 45:12–13, 112:20–21. He testified only that the cuffing was uncomfortable and caused him pain. *See id.* at 52:4–15, 112:25–113:2.

Mead's excessive-force claim fails. In the Fifth Circuit, "[t]ight handcuffing alone, even where a detainee sustains minor injuries, does not present an excessive[-]force claim." *Templeton v. Jarmillo*, 28 F.4th 618, 622 (5th Cir. 2022) (citing *Freeman*, 483 F.3d at 416–17; *Glenn v. City of Tyler*, 242 F.3d 307, 314 (5th Cir. 2001); and *Lockett v. New Orleans City*, 607 F.3d 992, 999 (5th Cir. 2010)). "[A]cute contusions of the wrist" from handcuffing, without more, will not state an excessive-force claim. *Tarver*, 410 F.3d at 751–52. Though Mead suffered pain from the tight handcuffs, the officers acted within the bounds of clearly established law when handcuffing him.

### 4. *James Springer's June 18 Arrest*

James Springer's excessive-force claim fails as well. After officers arrested David Bailey, they approached Springer and demanded his camera. PX-21 at 13:47:02. Springer pulled his arm back to keep his phone away from the officers. *Id.* at 13:47:05–:18. Officers then pushed Springer against a wall and handcuffed him. *Id.* at 13:47:23. Springer contends that these officers "caus[ed] significant pain and an injury" to his shoulder by "pinning [him] in place while pulling [his] arms in an unnatural position." Springer Aff. ¶ 4, ECF No. 153-3 at 82. In Texas, "pulling out of an officer's grasp is sufficient to constitute resisting arrest." *Ramirez*, 716 F.3d at 376. So, in short, officers pinned Springer against a wall after he resisted arrest by pulling his arm away.

Fifth Circuit case law cuts in both directions on these facts. Some cases support Springer's excessive-force argument. In *Trammell*, the suspect's "only physical resistance" to arrest "was his attempt to pull his arm away" from officers. *Trammell*, 868 F.3d at 341. Officers tackled the suspect in response. *See id.* Similarly, in *Goodson*, a suspect "pulled his arm away from [the officer] in surprise and stumbled back" when officers attempted to stop him. *Goodson v. City of*

*Corpus Christi*, 202 F.3d 730, 734 (5th Cir. 2000).  Instead, the officers tackled the suspect and broke his arm.  *Id.*  The Fifth Circuit, in both cases, held that genuine disputes of material fact existed as to whether the officers' uses of force were justified.  *Trammell*, 868 F.3d at 342; *Goodson*, 202 F.3d at 740.  But the Fifth Circuit's decision in *Freeman* leads to the opposite conclusion.  In *Freeman*, a plaintiff alleged that officers "twisted her arms behind her back" when handcuffing her and "jerked her all over the carport," leaving bruises that required medical treatment.  *Freeman*, 483 F.3d at 409–10, 416–17.  The Fifth Circuit held that these allegations did not constitute excessive force—the plaintiff's injuries were minor and incidental to the process of handcuffing a suspect during an arrest.  *Id.* at 416–17.

These competing cases, in and of themselves, imply that no law clearly establishes that officers may not push an arrestee into a wall to handcuff him.  The use of force in *Trammell* and *Goodson* (tackling a suspect) is greater than the force that officers used against Springer (shoving a suspect against a wall).  *Trammell*, 868 F.3d at 341; *Goodson*, 202 F.3d at 734; Springer Aff. ¶ 4.  The injuries in these cases are disproportionate as well.  The suspect in *Goodson* suffered a broken arm.  *Goodson*, 202 F.3d at 734.  Springer had an injured shoulder.  Springer Aff. ¶ 5.  Springer's injuries are akin to those in *Freeman*, in which the Fifth Circuit held that no constitutional violation occurred.  *Freeman*, 483 F.3d at 411.  Since no law clearly established that shoving a resistant arrestee into a wall would violate the Fourth Amendment, the officers are entitled to qualified immunity on Springer's excessive-force claim.

### 5. *Juan Gonzales's June 18 Arrest*

When officers arrested David Bailey and James Springer, they also arrested and handcuffed Juan Gonzales.  Gonzales testified that Officer Farias grabbed his arm and Corporal Mandry "slam[med] [him] up against the window."  Gonzales Dep. 79:3–4, 9–10.  Though Gonzales

"remained in handcuffs in the detainment area for about an hour," he suffered only "pain and bruises" on his wrists.  Gonzales Aff. ¶ 6, ECF No. 153-3 at 96; Gonzales Dep. 79:20–23.

Both officers are entitled to qualified immunity for Gonzales's excessive-force claim.  As discussed for Springer's excessive-force claim, no law clearly established that pushing an arrestee against a wall to handcuff him would violate the Fourth Amendment.  Though "a constitutional violation occurs when an officer tases, strikes, or violently slams" a non-resistant arrestee, *Darden*, 880 F.3d at 731, Officer Farias and Corporal Mandry's use of force fell well below that threshold. The cases finding constitutional violations for pushing an arrestee into an object involved far more violent conduct.  *See, e.g.*, *Trammell*, 868 F.3d at 342; *Goodson*, 202 F.3d at 740; *Bush*, 513 F.3d at 501.

### 6.    *Joseph Pierce's June 23 Seizure*

Joseph Pierce alleged that he suffered from a "humiliating sexual assault" by an unnamed officer while detained on June 23, 2018.  Second Am. Compl. ¶¶ 202, 206.  The officers assert a qualified-immunity defense.  LVPD Mot. 8.  Pierce did not respond to this motion.  A court may not grant a "default" summary judgment when a nonmovant fails to file a response.  *Morgan*, 114 F. Supp. 3d at 437.  But, at the summary judgment stage, a nonmoving party must "make a showing sufficient to establish the existence of an element essential to that party's case" if they "bear the burden of proof at trial."  *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  The nonmovant "must offer more than mere allegations."  *Melton*, 875 F.3d at 261 (quoting *King*, 821 F.3d at 654). No evidence on the record supports Pierce's allegation that an officer subjected him to a sexual assault.  Nor did Pierce even identify which officer assaulted him.  The Court thus concludes that the officers are entitled to summary judgment on Pierce's excessive-force claim.

### 7.   *Jonathan Green's June 23 Arrest*

Officers arrested Jonathan Green during Chief Salvaggio's "press conference" on June 23, 2018. According to Green, he offered no resistance when they handcuffed him. Jonathan Green Dep. 62:16–18, ECF No. 168-17. Green "remained in handcuffs behind my back and in pain [for] two and a half hours." Jonathan Green Aff. ¶ 8, ECF No. 153-3 at 92. Green testified that, while he remained in police custody, Officer Vasquez "reached down behind . . . [Green's] back, in between the chair, the seat, and [his] back where [his] hands were and grabbed ahold of the handcuffs and lifted them up violently." Jonathan Green Dep. 76:1–7. Officer Vasquez testified that he did not recall this incident. Vasquez Dep. 159:15–19. After being released, Green sought medical treatment and was diagnosed with a "moderately sprained right shoulder." *Id.* at 76:10–11. He did not have any follow-up treatment for this injury. *Id.* at 77:18–20.

To the extent that Green alleges excessive force for pain from the long-term handcuffing, his claim fails. As explained above, "[t]ight handcuffing alone, even where a detainee sustains minor injuries, does not present an excessive[-]force claim." *Templeton*, 28 F.4th at 622 (citing *Freeman*, 483 F.3d at 416–17; *Glenn*, 242 F.3d at 314; and *Lockett*, 607 F.3d at 999). Since Green alleges only that he suffered pain from his handcuffs, he has not sufficiently proven that a constitutional violation occurred.

Officer Vasquez, however, is not entitled to qualified immunity for pulling on Green's handcuffs. By June 2018, clearly established law provided "that, once a suspect has been handcuffed and subdued, and is no longer resisting, an officer's subsequent use of force is excessive." *Carroll v. Ellington*, 800 F.3d 154, 177 (5th Cir. 2015) (citing *Bush*, 513 F.3d at 501–02 (5th Cir. 2008); *Gomez v. Chandler*, 163 F.3d 921, 922, 924–25 (5th Cir. 1999)). Green's testimony, if believed, would lead a reasonable jury to conclude that Officer Vasquez used

excessive force by yanking Green's handcuffs.  Even though Officer Vasquez testified that he did

not recall the incident, Green's testimony suffices to raise a genuine dispute of material fact on

this claim.  Since *Carroll* clearly established that the use of force on a handcuffed, nonresistant

suspect violates the Fourth Amendment, Officer Vasquez is not entitled to qualified immunity for

this claim.

### 8.      *Jason Green's June 23 Arrest*

Plaintiff Jason Green brings an excessive-force claim to parallel his false-arrest claim.  This

claim must be dismissed.  After his arrest on June 23, Jason Green "remained in handcuffs . . . for

over seven hours."  Jason Green Aff. ¶ 8.  As explained above, "[t]ight handcuffing alone, even

where a detainee sustains minor injuries, does not present an excessive[-]force claim."  *Templeton*,

28 F.4th at 622 (citing *Freeman*, 483 F.3d at 416–17; *Glenn*, 242 F.3d at 314; and *Lockett*, 607

F.3d at 999).  Green's excessive-force claim thus fails as a matter of law.

### 9.      *Kevin Egan's June 23 Seizure*

Finally, plaintiff Kevin Egan brings an excessive-force claim based on the officers' failure

to provide medical treatment during the post-"press conference" seizures.  Second Am. Compl.

¶ 205.  This claim fails.  An excessive-force claim requires evidence of injury.  *Buehler*, 27 F.4th

at 981.  A reasonable jury could not find, based on the evidence on record, that Egan suffered an

injury on June 23.  In his deposition, Egan expressly stated that the only injury he suffered was "a

bruise on the back of my hand" where paramedics administered intravenous fluids.  Egan Dep.

96:9–97:4, ECF No. 168-17.  Egan's affidavit about the incident is, similarly, silent about any

injuries suffered.  *See* Egan Aff., ECF No. 153-3 at 99.  Because Egan has not met his burden of

production on the injury element, his excessive-force claim cannot survive summary judgment.

### E.    First Amendment Retaliation Claims

The Court turns next to plaintiffs' claims for First Amendment retaliation.  To establish a First Amendment retaliation claim, a plaintiff must show: "(1) "that [she] w[as] engaged in constitutionally protected activity, (2) the defendants' actions caused [her] to suffer an injury that would chill a person of ordinary firmness from continuing to engage in that activity, and (3) the defendants' adverse actions were substantially motivated against [her] exercise of constitutionally protected conduct." *Villarreal v. City of Laredo*, 17 F.4th 532, 542 (5th Cir. 2021) (quoting *Keenan v. Tejeda*, 290 F.3d 252, 258 (5th Cir. 2002) (alterations in original).  The LVPD officers move for summary judgment on qualified-immunity grounds.  LVPD Mot. 14.

By June 2018, the Fifth Circuit had clearly established that individuals have a First Amendment right to film the police. *See Buehler*, 27 F.4th at 976; *Turner v. Driver*, 848 F.3d 678, 689 (5th Cir. 2017).  In *Driver*, the Fifth Circuit concluded "that First Amendment principles, controlling authority, and persuasive precedent demonstrate that a First Amendment right to record the police *does exist*, subject only to reasonable time, place, and manner restrictions." *Driver*, 848 F.3d at 687 (emphasis added).[13]  The Court therefore holds that, at the time of the events in this case, the Fifth Circuit had clearly established the First Amendment right to record the police without being subject to retaliation. *Accord Caldwell v. Medina*, No. 1:19-cv-524 (RP), 2020 WL 4043501, at *11 (W.D. Tex. July 17, 2020) ("[T]he right to record police officers as they perform their official duties is clearly established.").

Plaintiffs also suffered injuries that would chill the speech of a person of ordinary firmness.  They argue that the arrests, detentions, uses of force, and seizures of property satisfy this element.

---

[13] In this decision, the Fifth Circuit aligned itself with other federal courts of appeals that have considered the issue. *See, e.g.*, *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017); *Am. Civil Liberties Union v. Alvarez*, 679 F.3d 583, 595–96 (7th Cir. 2012); *Glik v. Cunniffe*, 655 F.3d 78, 82, 85 (1st Cir. 2011); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995).

*See, e.g.*, Pls.' Resp. to Def. Officers 30, 32, 34. The Court agrees. Courts in this Circuit permit retaliation claims arising out of this type of conduct. *See, e.g.*, *Kokesh v. Curlee*, 14 F.4th 382, 396 (5th Cir. 2021) (explaining the requirements for a retaliatory-arrest claim); *Ybarra v. Davis*, 489 F. Supp. 3d 624, 630–32 (W.D. Tex. 2020) (holding that "being thrown to the ground by the neck and having three broken ribs" would chill a person of ordinary firmness).

But a plaintiff must show that any retaliatory animus was the "but-for" cause of her injury, "meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (citing *Hartman v. Moore*, 547 U.S. 250, 260 (2006)). So, when a plaintiff asserts a retaliatory-arrest claim, she "must first establish the absence of probable cause, and then demonstrate that the retaliation was a substantial or motivating factor behind the arrest." *Kokesh* 14 F.4th at 396 (citing *Nieves*, 139 S. Ct. at 1725). If an officer has probable cause to seize an individual, "the objectives of law enforcement take primacy over the citizen's right to avoid retaliation." *Davidson* 848 F.3d at 391 (quoting *Allen v. Cisneros*, 815 F.3d 239, 245 (5th Cir. 2016)). Just so "even where a citizen believes that he has been subject to a retaliatory detention or arrest." *Allen*, 815 F.3d at 244–45.[14]

The summary-judgment record provides plenty of evidence suggesting causation. On May 2, 2018, Chief Salvaggio sent an email titled "1st Amendment Auditor Group" about Jesus Padilla, who "abus[ed] [Leon Valley] staff," "refused . . . attempts to arrest him, and spat on/at officers as [officers] struggled to arrest him for his illegal behavior." ECF No. 153-3 at 5. Salvaggio "wanted everyone to be aware of [Padilla] and to use caution when dealing with him and his group." *Id.* Chief Salvaggio further explained his beliefs through deposition testimony. In a deposition, Chief

---

[14] A narrow exception exists for the probable-cause requirement "when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been." *Nieves*, 139 S. Ct. at 1727. But plaintiffs have not argued that this exception applies, so the Court will not discuss it further.

Salvaggio testified that he believed the plaintiffs to be part of a "group of auditors" that were "part of a larger group that goes around harassing government officials." Salvaggio Dep. 16:14–19. As Chief Salvaggio explained: "Regardless of whether some are good or some are bad, it's not relevant. They are a group called First Amendment auditors, and this is their MO they do at every city, every town that they go to, and it's not pretty." *Id.* at 23:11–15. A reasonable jury could infer that the officers would not have arrested, detained, or seized the plaintiffs' property if officers did not believe the plaintiffs were part of this group. After all, as Chief Salvaggio testified, a plaintiff "would not be there working with this group if he wasn't a member of the group." *Id.* at 23:23–24:7.

But because plaintiffs have asserted retaliation claims arising from their arrests, detentions, and seizures, they must meet an additional requirement. Plaintiffs must demonstrate (1) that the officers' arrests were unsupported by probable cause and (2) that "no reasonable police officer could have believed that probable cause existed." *Keenan*, 290 F.3d at 262. Each of plaintiffs' retaliation claims, then, will rise or fall based on the Court's holdings above. Compare two plaintiffs: David Bailey and James Springer. Officers arrested Bailey for obstructing a passageway; but, as the Court has explained, no reasonable officer could have believed that Bailey committed that offense. *See supra* Part III.A.2. Since Bailey has otherwise proven his retaliation claim, his claim survives summary judgment. Springer, in contrast, was arrested for resisting. *See supra* Part III.A.3. Because a reasonable officer could believe he had probable cause to arrest Bailey for that offense, the Court must grant the officers qualified immunity on Springer's corresponding retaliation claim.

Brown's First Amendment claim has another wrinkle because he alleged a claim for use of force. It remains an open question whether, under *Graham*, a plaintiff may bring a First

Amendment retaliation claim based on an officer's excessive force during a seizure. *Batyukova v. Doege*, 994 F.3d 717, 730 (5th Cir. 2021). District courts in this circuit have come to opposite conclusions. *Compare Ybarra*, 489 F. Supp. 3d at 632, *with Price v. Elder*, 175 F. Supp. 3d 676, 679 (N.D. Miss. 2016). The defendant officers, however, have not briefed this argument. *See* LVPD Mot. 12–14; LVPD Resp. 12; LVPD Reply 2–3. The Court therefore assumes that a parallel First Amendment retaliation claim is cognizable for a Fourth Amendment excessive-force claim. As the Court has discussed, *see supra* Part III.D.1, there is a genuine dispute of material fact about whether Brown resisted when being arrested. A reasonable jury, believing that Brown did not resist, could conclude that the officers retaliated against Brown for exercising his First Amendment right to film the police. This claim thus survives summary judgment.

Separately, plaintiffs moved for summary judgment on these First Amendment retaliation claims. This motion fails—because the defendant officers are now the nonmovants, the Court must construe facts in their favor. *Ford Motor Co.*, 264 F.3d at 498. Chief Salvaggio's report states that Leon Valley received "flood calling" and "death threats" related to protestors. *See, e.g.*, ECF No. 154-8 at 2, 4. If believed, this evidence indicates that the officers' motive for the arrests, seizures, and force used was to ensure the officers' safety; not to retaliate against the protestors. Plaintiffs' motion for summary judgment thus fails.

### F.     Municipal Liability for the City of Leon Valley

Finally, the Court arrives at the claims against the City of Leon Valley. A municipality may be sued under § 1983 if a plaintiff alleges a constitutional violation caused by "a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *See Monell v. N.Y. City Dep't of Soc. Servs.*, 436 U.S. 658, 659 (1978). To state a *Monell* claim, a plaintiff must show: (1) that "an official policymaker with actual or constructive

knowledge of the constitutional violation acted on behalf of the municipality"; (2) that the allegedly unconstitutional action is a "custom or policy" of the municipality; and (3) that the custom or policy was the "moving force" behind the constitutional violation. *Brown v. Tarrant Cnty.*, 985 F.3d 489, 497 (5th Cir. 2021) (quoting *Zarnow v. City of Wichita Falls*, 614 F.3d 161, 166–69 (5th Cir. 2010)). "[T]he unconstitutional conduct must be directly attributable to the municipality through some sort of official action or imprimatur; isolated unconstitutional actions by municipal employees will almost never trigger liability." *Piotrowski v. City of Houston*, 237 F.3d 567, 578 (5th Cir. 2001) (citations and footnotes omitted). In the Court's view, plaintiffs' *Monell* claim must be dismissed. Plaintiffs point the finger at Chief Salvaggio, but the chief was not a final policymaker. And even if Chief Salvaggio were a final policymaker, the isolated instances of unconstitutional conduct do not constitute a "custom or policy."

### 1.   *Leon Valley Policymakers*

To start, plaintiffs must identify a policymaker. *Brown*, 985 F.3d at 497. A policymaker "take[s] the place of the governing body in a designated area of city administration," "decide[s] the goals for a particular city function," and "devise[s] the means of achieving those goals." *Zarnow*, 614 F.3d at 167 (citations omitted). But not all city officials—even those who carry authority to make decisions—are policymakers. In this analysis, a court must "identify those officials or governmental bodies who speak with *final policymaking authority* for the local government actor concerning the action alleged to have cause the particular constitutional or statutory violation at issue." *Bolton v. City of Dallas*, 541 F.3d 545, 548 (5th Cir. 2008) (emphasis added).

Plaintiffs identify two potential final policymakers: the Leon Valley city manager and Chief Salvaggio. Second Am. Compl. ¶ 78; Pls.' Mot. 47.[15]  The City concedes that the city manager is a policymaker, as revealed by the City's charter and ordinances. Leon Valley Mot. 14–15. The Leon Valley city manager, after all, has authority to hire, fire, and supervise the police chief and other officers. *See* ECF No. 151-1 at 222–23, 232. But Chief Salvaggio's power did not rise to the level of final policymaking authority.

Because Chief Salvaggio's policies were subject to review by the Leon Valley city manager, Chief Salvaggio was not a final policymaker for Leon Valley. True, plaintiffs' evidence shows that one of Chief Salvaggio's "direct responsibilities" involved providing security to city property. Caldera Dep. 21:10–14, ECF No. 154-33. And a Leon Valley city manager attested that the local police chief was "ultimately responsible" for training police officers and for "police department policies." *Id.* at 26:22–27:8; 27:24–28:2. But "[r]eview procedures are relevant to show that someone 'is *not* a final policymaker.'" *Advanced Tech. Bldg. Sols., L.L.C. v. City of Jackson*, 817 F.3d 163, 166–67 (5th Cir. 2016) (quoting *Bolton*, 541 F.3d at 550 n.4).[16]  According to the city manager, Chief Salvaggio had authority only to implement "[p]olicies that were approved by the city manager." Caldera Dep. 19:20–24. The Court cannot infer that Chief Salvaggio's actions spoke for the municipality from the fact that he decided how to train and instruct his officers. *See Valle v. City of Houston*, 613 F.3d 536, 543–44 (5th Cir. 2010). At

---

[15] Plaintiffs originally identified Lieutenant Anderson as an alleged policymaker. Second Am. Compl. ¶ 78. They appear to have abandoned this claim at summary judgment. *See* Pls.' Mot. 47.

[16] This "administrative reviewability" is critical to distinguish "final decisionmaking authority from final policymaking authority." *Gelin v. Hous. Auth. of New Orleans*, 456 F.3d 525, 530 (5th Cir. 2006); *cf. Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 n.12 (1986) (explaining that "only [a county board's] decisions would provide a basis for [municipal] liability" even if a county sheriff "[had] discretion to hire and fire employees").

bottom, the city manager had the power to approve of Chief Salvaggio's actions. This power prevents the Court from holding that Salvaggio was a final policymaker for Leon Valley.

Nor can the Court hold that the City delegated its policymaking authority to Chief Salvaggio. Not "all delegations of authority . . . are delegations of *policymaking* authority"—some may be only the "discretion to exercise a particular function." *Webb v. Town of Saint Joseph*, 925 F.3d 209, 215 (5th Cir. 2019). Put another way, "[a] municipality can be held liable only when it delegates policymaking authority, not when it delegates *decisionmaking* authority." *M.L. v. San Benito Indep. Consolid. Sch. Dist.*, 942 F.3d 258, 271 (5th Cir. 2019). Chief Salvaggio may have had discretion to decide how to perform law-enforcement activities and maintain security at City Hall. But this evidence does not suggest that Chief Salvaggio had unilateral authority to decide Leon Valley's criminal-justice goals and the means of achieving those goals.[17] Since a reasonable jury could not find that Chief Salvaggio was a final policymaker for the City of Leon Valley, the City is entitled to summary judgment on plaintiffs' municipal-liability claim.

### 2.      *Custom or Policy*

Plaintiffs' claims fail for a separate reason—they have not identified a custom or policy of unconstitutional practices. A plaintiff can establish a custom or policy by pointing to: (1) a written policy statement, ordinance, or regulation, (2) a "widespread practice that is so common and well-settled" that it "constitute[s] a custom" representing municipal policy,  or (3) a single action by an official or entity with "final policymaking authority" for that action when the action "forms the

---

[17] Were the Court to accept plaintiffs' arguments that Chief Salvaggio's unilateral decisions on when to arrest certain individuals were Leon Valley policy, then cities could be held liable for any unconstitutional actions by their subordinates.  The Supreme Court has roundly rejected this *respondeat superior*-like theory of liability. *See, e.g.*, *Prapotnik v. City of St. Louis*, 485 U.S. 112, 126 (1988) ("If the mere exercise of discretion by an employee could give rise to [liability for] a constitutional violation, the result would be indistinguishable from *respondeat superior* liability.").

basis of the § 1983 claim." *Webb*, 925 F.3d at 214–15 (quoting *Alvarez v. City of Brownsville*, 904 F.3d 382, 389–90 (5th Cir. 2018); *Davidson*, 848 F.3d at 395).

Plaintiffs have not identified a written policy statement requiring that officers commit constitutional violations.  Instead, they argue that the LVPD engaged in three "unwritten policies, customs and practices" that "target[ed] citizens engaged in First Amendment activities": (1) a policy to enforce a "court decorum order"; (2) a policy to issue criminal-trespass citations to any protestor who interacted with the LVPD; and (3) a policy to arrest and charge protestors who refused to identify themselves or turn over recording devices.  Pls.' Resp. to City Mot. 6.  None of these allegedly unwritten policies pass muster.

First, plaintiffs' arguments regarding the court-decorum order fail as a matter of law.  A municipality lacks power to control the "judicial actions" of a "municipal judge acting in his judicial capacity." *Whisenant v. City of Haltom City*, 106 F. App'x 915, 917 (5th Cir. 2004).  A municipal judge institutes municipal policy only with respect to "administrative duties," not judicial duties. *Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).  The power to enforce decorum in furtherance of court proceedings is a quintessential judicial function. *See Hall v. Boothe*, 47 F.3d 424 (5th Cir. 1995) (acknowledging the "essential judicial responsibility" to "secure dignity and decorum in [a judge's] courtroom"); *cf. Anderson v. Dunn*, 19 U.S. 204, 227 (1821) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence . . . and, as a corollary to this proposition, to preserve themselves and their officers from the approach and insults of pollution.").  The order itself reflects this notion—it applies only to "courtroom and court business areas," explains that "only one person may speak" unless an attorney is objecting, and was signed by the judge himself.  Standing Order, ECF No. 151-1 at 16.  Leon Valley had no authority to control these judicial acts,

54

so the municipal judge's standing order cannot serve as the "policy or custom" underlying a *Monell* claim.

Second, plaintiffs' allegations of a "criminal trespass policy" fail because any policy, if it existed, would be constitutional. Texas's criminal trespass statute states, in relevant part, that "[a] a person commits an offense if the person enters or remains on or in property of another . . . without effective consent and the person . . . had notice that entry was forbidden." Tex. Penal Code § 30.05(a). "Notice" includes "oral or written communication by the owner or someone with apparent authority to act for the owner." *Id.* § 30.05(b)(2)(A). Plaintiffs have not shown—or even alleged—that they were arrested for criminal trespass.[18] Rather, the allegation is that the mere *issuance* of criminal-trespass warnings would stifle the plaintiffs' constitutional rights. But this alleged policy would be well within the scope of the statute. A reasonable person in plaintiffs' position would believe that the officers had authority to act on behalf of Leon Valley. *Cf. Wilson v. State*, 504 S.W.3d 337, 371 (Tex. App.—Beaumont 2016, pet. ref'd) (providing example of an officer validly providing a criminal-trespass warning on behalf of a municipality). That's all that the officers did here—provide the plaintiffs with notice that, should they return to Leon Valley property, they would be arrested. *See* PX-19 at 13:43:00 (showing an officer reading a criminal-trespass warning to plaintiff Gonzales); ECF No. 154-49 (providing examples of the written trespass warnings).

Finally, plaintiffs' alleged "identify, seize, and arrest" policy falls far short of demonstrating the type of persistent, widespread violations of constitutional rights giving rise to municipal liability. Plaintiffs ask the Court to infer this unwritten policy based on the arrests and detentions in May and June 2018. *See* Pls.' Resp. to City Mot. 6. But the Fifth Circuit has

---

[18] Though Jesus Padilla *was* arrested for criminal trespass on June 14, 2018, he is a nonparty to this lawsuit.

counseled against doing so. This case is most akin to *Culbertson v. Lykos*, in which the Fifth Circuit evaluated an alleged "retaliatory campaign" by government officials. *Culbertson v. Lykos*, 790 F.3d 608, 628 (5th Cir. 2015). Though "[t]he retaliatory campaign against [the plaintiffs] was publicly known," they "offered no evidence that similar retaliation had victimized others." *Id.* The *Culbertson* court thus held that these isolated instances did not constitute a policy or custom supporting municipal liability. *Id.* In another case, the Fifth Circuit considered whether dozens of excessive-force violations constituted a "pattern . . . that can be said to represent official policy." *Peterson v. City of Fort Worth*, 588 F.3d 838, 850 (5th Cir. 2009). That court disagreed—a pattern, in its view, required "sufficiently numerous prior incidents as opposed to isolated instances." *Id.* at 851; *see also Villarreal v. City of Laredo*, 17 F.4th 532, 546 (5th Cir. 2021) (denying a *Monell* claim because a plaintiff "[did] not allege that city employees retaliated against, investigated, or arrested anyone *else* because of their speech" (emphasis added)); *Lansdell v. Miller*, 817 F. App'x 27, 28 (5th Cir. 2020) (noting that a court "cannot infer the existence of a policy merely from the conduct of several officers during one incident"). The same is true in this case. The various arrests and seizures in May and June 2018 do not show a pattern of constitutional violations affecting the whole of Leon Valley.

### 3.    *Alleged Failures to Train, Supervise, and Discipline*

Plaintiffs' complaint alleges that Leon Valley failed to train, monitor, discipline, and investigate LVPD officers. Second Am. Compl. ¶¶ 221–22. A municipality's failure to train or failure to supervise its agents can represent a policy giving rise to *Monell* liability. *Brown v. Bryan Cnty.*, 219 F.3d 450, 457 (5th Cir. 2000). The problem? None of plaintiffs' briefing materials discuss these failure-to-train, failure-to-supervise, or failure-to-discipline theories. *See* Pls.' Mot.; Pls.' Resp. to City Mot., ECF No. 171-1; Pls.' Reply to Def. City, ECF No. 181. "If a party fails

to assert a legal reason why summary judgment should not be granted, that ground is waived." *Keenan*, 290 F.3d at 262 (quoting *Grenier v. Cyanamid Plastics, Inc.*, 70 F.3d 667, 678 (1st Cir. 1995)); *see also Nautilus, Inc. v. ICON Health & Fitness, Inc.*, No. 5:16-cv-80 (RCL), 2018 WL 2107729, at *3 (W.D. Tex. May 7, 2018).

Plaintiffs must have known that these theories were on the table because the City discussed these theories in detail in its motion for summary judgment. City Mot. 15–19. But plaintiffs' response names only the unwritten policies discussed above. *See* Pls.' Resp. to City Mot. 6. Though plaintiffs use the words "train" and "supervise," *see id.* at 37 & 39, these one-off references to an entirely separate legal theory cannot suffice at summary judgment. *See Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019) ("A brief's stray reference to a fact— with no explanation of its import—fails to defeat a summary judgment motion."). Plaintiffs' arguments based on failure-to-train, failure-to-supervise, or failure-to-discipline theories thus fail.

## IV.   CONCLUSION

For the reasons above, the Court will **GRANT IN PART** and **DENY IN PART** the defendant officers' motion for summary judgment. The following claims shall proceed to trial:

- <u>Mark Brown</u>: Count 2 (First Amendment Retaliation) and Count 3 (Excessive Force as to Officers Farias, Yarbrough, and Vasquez).

- <u>David Bailey</u>: Count 6 (False Arrest on June 18, 2018) and Count 7 (First Amendment Retaliation).

- <u>Juan Gonzales</u>: Count 6 (Unlawful Seizure on June 18, 2018) and Count 7 (First Amendment Retaliation).

- <u>James Mead</u>: Count 6 (Unlawful Seizure on June 18, 2018) and Count 7 (First Amendment Retaliation).

- <u>Jonathan Green</u>: Count 11 (False Arrest on June 23, 2018), Count 12 (First Amendment Retaliation), and Count 13 (Excessive Force as to Officer Vasquez).

- Jason Green: Count 11 (Unlawful Seizure on June 23, 2018) and
  Count 12 (First Amendment Retaliation).

The remaining claims against the defendant officers will be **DISMISSED**.   The Court will **GRANT** the City of Leon Valley's motion for summary judgment and **DISMISS** plaintiffs' *Monell* claim.   Plaintiffs' cross-motion for partial summary judgment will be **DENIED** in full.

Additionally, because of extensive video evidence, the Court believes that there are no genuine disputes of material fact as to the following claims:

- David Bailey: Count 6 (False Arrest on June 18, 2018).

- Juan Gonzales: Count 6 (Unlawful Seizure on June 18, 2018).

- James Mead: Count 6 (Unlawful Seizure on June 18, 2018).

- Jonathan Green: Count 11 (False Arrest on June 23, 2018).

*See supra* Parts III.A.2, A.6, B.1, B.2. Plaintiffs did not move for summary judgment as to these claims. *See* Pls.' Mot.  After providing "notice and a reasonable time to respond," a court may (1) grant summary judgment for a nonmovant, (2) grant a summary-judgment motion on grounds not raised by a party, or (3) consider summary judgment on its own after identifying "material facts that may not be genuinely in dispute." Fed. R. Civ. P. 56(f).  The Court will therefore **ORDER** the defendant officers to show cause within 14 days as to why the Court should not, of its own accord, grant summary judgment in plaintiffs' favor on these claims.

Because the parties submitted evidence under seal, the Court has filed this memorandum opinion temporarily under seal. Both parties will be **ORDERED** to identify proposed redactions to this memorandum opinion and the corresponding order, if any, within 7 days of this date. The Court will file a redacted version of the memorandum opinion on the public docket thereafter.

A separate order consistent with this memorandum opinion shall issue this date.

Date: July 7, 2022

Royce C. Lamberth
United States District Judge